## DUNHAM v. THE STATE OF IOWA.

Chapter 251 of the Laws of 1857, entitled "An act providing for appeals in criminal cases," does not confer the right to appeal from an order to punish for a contempt.

The mode of revision in cases of contempt is by *certiorari*, under section 1606 of the Code.

Chapter 251 of the Laws of 1857, providing for appeals in criminal cases, refers to those cases in the same sense, and in the same manner, in which they are referred to in chapter 184 of the Code, and only changes the manner of bringing such cases to the appellate court.

To constitute a contempt, under the first specification of section 1598 of the Code, the act or behavior complained of, must have taken place in the actual or constructive presence of the court.

To render a party guilty of a contempt, under the first specification of section 1598 of the Code, the contemptuous or insolent behavior must be *towards the court*—the court must be engaged in the *discharge* of a judicial duty—and the behavior must tend to impair the respect due to its authority.

The contemptuous and insolent behavior need not be in the court room, and under the eye of the court, in order to amount to a contempt.

Where by a general rule, or by a special rule made as to some case on trial, the publication of the testimony pending an investigation, has been prohibited, a wilful violation of such rule, may amount to a contempt, upon the ground that it would be a resistance to the order thus made; and especially so, if the rule itself declared such an act a contempt.

| 6 | 245 |
| 126 | 349 |
| 126 | 351 |

The provisions of the Code upon the subject of contempts, are a limitation upon the power of the court to punish for any other contempts.

The publication of articles in a newspaper, reflecting upon the conduct of a judge, in relation to causes pending in his court, and which were disposed of before the publication, or the publication of the evidence and the arguments of counsel in a case undisposed of, in which there was no rule of court prohibiting such publication, however unjust and libellous the publications may be, do not amount to contemptuous or violent behavior towards the court, under chapter 94 of the Code; nor are they so calculated to impede, embarrass, or obstruct the court in the administration of the law, as to justify the summary punishment of the offender under that chapter.

*Certiorari to the Des Moines District Court.*

SATURDAY, JUNE 19.

The plaintiff in error is the editor and proprietor of "The Daily Hawkeye," a newspaper published in the city of Burlington, in this State. In November, 1857, one Abrahams was tried and convicted of a criminal offence, before the Hon. Thomas W. Claggett, judge of the first judicial district, and then holding court in said city. Of this trial and conviction, the said Dunham published the following article in his said paper:

"In the malicious prosecution pending against J. F. Abrahams, under the rulings of the court, he was convicted of leasing his house for improper purposes, and fined by Judge Claggett, $100. Upon his appearing and offering to appeal to the supreme court, Judge Claggett fixed the bail at *fifty thousand dollars.* What do our readers think of the fairness and impartiality of a judge who is guilty of this extortionary demand, in direct violation of the eighth amendment to the constitution—' excessive bail shall not be required.' In the light of this oppressive demand, it is easy to see what an engine of injustice and outrage our courts of justice are capable of being made, in the hands of a vindictive and implacable man, such as we hope Judge Claggett will not prove himself, or corrupt and

infamous men, such as Lecompte and Cato, of Kansas. We do not believe our records have ever before been disgraced by, or our archives contained, such a bail bond, as that demanded by Claggett, and given yesterday by J. F. Abrahams. Fifty thousand dollars bail, in a case wherein the sentence of the court was a fine of one hundred dollars! Has the case a parallel?"

Upon the sworn relation of the said judge, a writ was issued and served upon said Dunham, commanding him to appear before said district court, and show cause why he should not be punished for a contempt, for and on account of said publication. In obedience to the writ, he appeared and answered; admitting that he was the editor and proprietor of said paper, and that the said article was published therein, by the direction and authority of the respondent. He further answered that said case of the State v. Abrahams had, at the time of the publication, been fully adjudicated in the district court, and taken by appeal to the supreme court; that his object and purpose was to condemn the action of the court, in requiring Abrahams to give fifty thousand dollars bail; and that in doing so, he intended no disrespect to the court. He also says he had a right to publish the facts and comments, as they appear in said article; denies that he is amenable to the court in this summary method, for said publication, and further denies the right or power of the court to thus call upon him to answer, or that said publication amounts to a contempt.

A hearing was had as to this charge, but before its determination, the respondent, in the same paper, published the following articles :

" THE FIRST ATTEMPT IN IOWA TO MUZZLE THE PRESS.— Waiting no longer for the decision of the court, we shall to-morrow publish a correct, and so far as we can make it, full and complete report of the arrest and trial of C. Dunham, in violation of his constitutional rights, and his priv-

ileges of trial by jury, for daring to speak of the doings of Judge Claggett and the circuit court. We shall give a full account of this high-handed assault upon the liberty of the press, by a vindictive and august judge, with the speeches of counsel, Hon. J. C. Hall, and Hon. H. W. Starr, response of court, &c., &c. Extra copies of the "Hawkeye," can be had at this office and at the news depots."

"THE DIFFERENCE.—The other day, upon a bare surmise that it would be prosecuted, under the law, and according to law, for what it had published, the "Gazette" blubbered and snivelled, and appealed to the sympathy of this community.

"At the mere will and pleasure of an august and arbitrary judge, in violation of his constitutional rights, the editor of this paper was arrested and carried before Judge Claggett, for daring to express his opinion of the doings of the circuit court, in a case already adjudicated. We have neither cried over it, nor called for public sympathy. Yet the most intense interest has been felt in this community, and democrats, republicans—men of all parties— have not only expressed their sympathy, but their determination to see the liberty of speech and the press vindicated, and the petty tyrant who disgraces the judiciary of Iowa, shorn of the power he is now abusing."

"We hear that Mr. M. D. Browning, one of the oldest and most distinguished lawyers in the State, has declared his unwillingness to appear in any case before Judge Claggett. He retires from the practice of the law before the circuit court, until the impeachment, or resignation, of Claggett!"

"ANOTHER NICE CASE.—A case was before the circuit court last week, which has had but few parallels. It was a suit for seduction on the part of a Swede woman, and a widow, aged forty-seven, against a man named Boke.

Upon oath, she declared that the seduction occurred three weeks after the death of her husband, upon a promise of marriage on the part of Boke.  It hardly seems possible that a jury of twelve men, on their oaths, could find a man guilty upon such a showing; yet, upon the pointed charge of the court, the jurors did bring in a verdict of guilty, and the woman and her friends were thus aided in their scheme of extortion.   Boke, having no chance for fair play before Claggett, resolved to carry his case before another tribunal. He appealed to the supreme court.   But the court resolving, as it has in every instance, to hold the issues in its own hands, put up the bail bond at three thousand dollars, believing that sum beyond the reach of the defendant. But the oppression of the court defeated its own ends. Under the feeling of outrage and injustice, gentlemen came forward and went upon the appeal bond, who would not have signed a two hundred dollar, or any other bond for him, under any other circumstances.   There is a spirit abroad in this community, which says, as plainly as anything can be said, that no man shall use his position and power as a judge, to gratify his own private pique and malice, and to oppress and outrage those who incur his displeasure."

These articles were published on the 10th of November, and on the 11th there was published in the same paper, a very full account of the hearing on the first charge, and including what the respondent represents to be, the substance of the argument of counsel and the remarks of the court.   The said article also contains the comments of the respondent, referring to the manner in which the prosecution originated, and referring in strong terms of condemnation, to Judge Claggett, and in disparagement of his integrity as well as ability.   This article is very lengthy, and is not embodied in this statement, for the reason that the language used in it is substantially the same, so far as it relates to the judge or the court, as that contained in the articles above set out.   Other parts of it, so far as ma-

terial, will be found referred to in the opinion of the court.

A second information was filed by Judge Claggett, charging the respondent with being guilty of contempt, in publishing these articles in his paper in the 10th and 11th of November. He was accordingly arrested, and in relation thereto, he, on the 13th of the month, published the following article:

"MORE CONTEMPT.—Yesterday afternoon, we were again cited to appear forthwith before Judge Claggett, and show cause why we should not be punished for a second contempt of court, the first case not having yet been disposed of. It is certainly a refinement upon the legal technicality, for Judge Claggett to charge us with attempting to influence his decision, in our own case, by reproducing in print, the arguments which were made before him, and his rejoinder. And he *swears* that in that publication, our object was to influence his high mightiness. And it certainly is a legal fiction to say, that there was any cause pending. There never was a cause. Judge Claggett constituted himself judge and jury, and would have added the character of executioner, if he had dared. His attempted censorship of the press, as it appeared in our forcible arrest and trial, never had a color of law, and was not a cause pending in any fair sense of the word. It was an outrage—it was a mockery—it was anything, rather than a cause pending in any legal and proper sense. We had the same right to publish it, as we should have had in publishing an account of our forcible abduction, when we might escape from our lawless captors. It is Judge Claggett's second effort to deprive us of our rights, and prevent his arbitrary and tyrannical acts from becoming known through the medium of the press."

For publishing this article, the respondent was charged the third time with contempt, upon the information of the prosecuting attorney of Des Moines county. Being arrested, he appeared and answered the second and third

charges—admitting the publications, and setting up the same matters as in his answer to the first charge. He also says that what he published, he believes to be true; that he is not aware of any rule of said court, prohibiting the proprietors of newspapers from publishing the proceedings, acts and judgments of said court, either pending their trial, or after their determination; that said publication had no connection with the court; that he is not guilty of any contemptuous or insolent behavior towards the court, while in the discharge of any judicial duty; and that, in all that he has done, he has kept remote from the court; and he insists that he is liable, if liable at all, not in this summary method, but only according to the course of the law.

The respondent was discharged under the first charge; found guilty under the second and third, and fined fifty dollars; and to reverse this conviction, he prosecutes this suit.

*J. C. Hall* and *C. Ben Darwin*, for the plaintiff in error, cited the following authorities: 4 Black. Com., 279; 7 Cranch, 34; *Anderson* v. *Dunn*, 6 Wheat., 204; 3 Cushman, 440; 4 Cranch, 94; 1 Blackf., 166; *Ex parte Hickman*, 4 Smedes & M., 751; *Skiff* v. *The State*, 2 Iowa, 550; 2 Vesey, 520; 2 Curtis, 447; 1 Caines, 518; 1 Dallas, 319; *Stuart* v. *The People*, 3 Scam., 395; 4 Black. Com., 32; 2 Atkins, 82; Wallace C. C., 76; 7 Cranch, 447; Wright (Ohio), 78.

*Samuel A. Rice*, (Atty. General), for the State.

I. The power to punish for a contempt is one that is inherent in every court, and is necessary for its preservation. The legislature has no power, either by an affirmative or negative statute, to take away or abridge this power; and any attempt upon their part so to do, would be an infringement upon the constitutional rights of an equal and co-ordinate branch of the government, and would be unconstitutional and void.

II.   The causes of contempt set forth in the Code, are merely an affirmance of the common law, as far as they go, and cannot be held to take away the right of the court to punish for other acts or proceedings, which tend to impair the respect due to its authority.

III.  A newspaper publication concerning a matter pending in court, and which goes to impair the respect due to its authority, or to bring it into ridicule, is a contempt of court, and can be punished accordingly.   As fully sustaining the foregoing views, the following authorities are referred to:  4 Blackstone, 279, 285, 32; 6 Wheaton, 204; 4 Cranch, 94; 1 Blackf., 166; 4 Smedes & Marsh, 751; 2 Iowa, 69, 550; 7 Cranch, 447; Kent Com., 328; Wright (Ohio), 421; 3 Scam., 404; J. Williams R., 679; 2 Vesey, 520; 1 Dallas, 319; Wallace Cir. Co., 76; 2 Atkins, 82; Dunlap's Fed. Com. Law, 54.

WRIGHT, C. J.—This case was first brought to this court by appeal.   A motion was made to dismiss, for the reason that *certiorari*, and not appeal, was the proper process. This motion was sustained for the reasons following:  Under the Code, the only mode of reviewing a judgment or order in a criminal action, is by a writ of error, as prescribed in chapter 184.   By chapter 251 of the Laws of 1857, 412, the right to appeal is given in all criminal cases where judgment may be rendered in any of the district courts of the State, by complying with the provisions of said chapter.   The 1606 section of the Code, provides that "no appeal lies to an order to punish for a contempt, but the proceedings may, in proper cases, be taken to a higher court for revision, by *certiorari*."   In our opinion, chapter 251 of the Laws of 1857, does not give the right to appeal from an order to punish for a contempt.   The mode of revision, in such cases, remains the same as it did before the passage of the late law.   This last law refers to criminal cases in the same sense, and the same manner, in which they are referred to by the Code, and only changes the method of bringing such cases to this court. *The First*

*Cong. Church* v. *City of Muscatine*, 2 Iowa, 69. The appeal was, for these reasons, dismissed.

The case is now before us, however, by *certiorari*, and we proceed to examine it upon its merits. From its novelty in this State, and the character of the questions involved, this case has occupied no little space in the public mind. The record of facts is somewhat voluminous, and present various acts on the part of the respondent, which are claimed to be contempts, and punishable by the district court. And yet, notwithstanding its public importance, and the repeated publications charged to have been made by the respondent, and admitted by him ; and while the case belongs to that class of cases which it is always unpleasant to adjudicate, we are of the opinion that the consideration and application of a few general principles, will be sufficient for its disposition.

⌐In the examination, we have endeavored to keep constantly in view, what is due from the citizen to the authority and power of the courts of the State. And on the other hand, as was our duty, we have had regard to the liberty of the individual, and the proper freedom of the public press. As the power to punish for contempt, is a necessary one—necessary to the very existence of judicial tribunals, and their efficiency and own preservation—and while it is a power that is not only inherent in every court, but one that is abundantly recognized by the constitution and laws of the several States; so, on the other hand, the personal liberty of the individual—and the liberty of speech and the press—are made no less secure, and are upheld by considerations equally important, and essential to the prosperity and advancement of every free government. In consonance with these rights, our own constitution declares, that no law shall be framed to restrain or abridge the liberty of speech or the press, and that every person may publish his sentiments on all subjects, being responsible for the abuse of that right. It is also declared that the right of the people to be secure in their persons, shall not be violated; that the right of trial by jury, shall

remain inviolate; and that no person shall be deprived of life, liberty, or property, without due process of law. The liberty of the press, however, should never be confounded with its licentiousness, nor should a fear of its licentiousness, justify the abridgement of its proper and necessary liberty.

The power given to the courts to punish for contempts, is not alone for their own preservation, but also for the safety and benefit of the public. The life, liberty and property of every citizen, are protected, and the true welfare of society ensured and promoted, in the preservation of this power in its proper vigor and efficiency. Take from our courts this power—deprive them of this trust—and they would be subject to the clamorous demands of an excited mob—to disturbances calculated to interrupt the due course of judicial proceedings. Every order and process made or issued, might be illegally resisted, with comparative impunity; and at no very distant day, they would cease to command the respect of the public, or be able to secure obedience to their mandates. This respect and this obedience, they must command and secure, however, upon the principle that the power to punish for contempt, is a preservative power, and should not be used for vindictive purposes. It is a power delicate in its character. Necessity alone, should justify a resort to it. It must be used and applied by the soundest discretion. "Respect to courts cannot be compelled. It is the voluntary tribute of the public, to worth, virtue and intelligence, and while they are found on the judgment seat, so long and no longer, will they retain the public confidence." *Stewart* v. *The People*, 3 Scam., 395.

Our Code declares that certain acts or omissions therein named, are contempts, and are punishable as such, by the courts of the State, or any judicial officer acting in the discharge of an official duty. The acts charged in this case, if punishable under the Code, must be so by virtue of the first clause of section 1598, as being "contemptuous or insolent behavior toward the court, while engaged in the discharge of a judicial duty, which may tend to impair

the respect due to its authority." In this view, however, we cannot concur. We think this clause has reference to some act or behaviour in the actual or constructive presence of the court. The use of the words, "behavior towards"—"while engaged"—and "in the discharge of"—would clearly seem to show that this was intended. Not, it is true, that the contemptuous and insolent behavior, need be in the court room, and under the eye of the court, in order to amount to a contempt. But, the court being in the discharge of its judicial duties, the guilty party, though not in its' immediate presence, might do those things which would amount to a contempt. Thus, if the respondent had procured, to be posted within the court room, pictures or articles, calculated to obstruct, embarrass or implede the administration of justice, or impair the respect due to the authority of the court, either by carricaturing the judge, or otherwise, the act might well be said to be done in the presence of the court, it would be "behavior towards said court." So, also, a person outside of the court room, but within hearing, might make use of such language, or do those things, which would render him liable for contempt, as fully as though spoken or done within the bar. But to make a party guilty under this clause, the contempt, or insolent behavior must be towards the court—the court must be engaged in the discharge of a judicial duty—and this behavior must tend to impair the respect due to its authority. It would be a perversion of the entire language used, and a palpable violation of the spirit and policy of the provision, to say that a judge could bring before him every editor, publisher, or citizen, who might, in his office—in his house—in the streets—away from the court, by printing, writing, or speaking, comment upon his decisions, or question his integrity or capacity. The law never designed this. It is not thus that an independent and intelligent court, will be apt to secure public confidence. Such a power is not necessary, for either the protection of the court or the public.

If by general rule, or by special rule made as to some case on trial, the publication of the testimony pending the investigation, had been prohibited, a willful violation of such rule, might amount to a contempt, upon the ground that it would be a resistance to the order thus made; and especially so, if the rule itself declared such an act a contempt. Such rules are not unfrequently made, and are often calculated to prevent improper impressions being made upon jurors, to the injury of the parties litigating. No such rule is pretended to have been made by the court below. If, therefore, the respondent did nothing more than comment, though never so severely, upon the action of the court; and though he may have published ever so fully, and, whether truly or falsely, the proceedings upon the first hearing, we cannot think it would amount to a contempt, under the first clause of the section under consideration. We, of course, know nothing of the accuracy of the account published of said hearing. Nor, or the purposes of this inquiry, is it material that we should. Nor are we to be understood as sanctioning the propriety of the course pursued by respondent, in his comments and references to the proceedings of the court. If his attack were libellous, then it seems to us, that he and the judge assailed, should be placed on the same grounds, and "their common arbiter, should be a jury of the country." No court can or should hope, that its opinions and actions can escape discussion or criticism. When a case is disposed of, and the decision announced, such decision becomes public property, so to speak. The construction given to a statute —the reasoning and conclusion of the court upon the facts—all go to the public, and become subject to public scrutiny and investigation. In such cases, it is perfectly competent and lawful, for any one to comment upon the decision, and expose its errors and inconsistencies. If such comments do not correct errors, they will, at least, lead to renewed caution and circumspection upon the part

of those whose duty it is to declare the law.   It would be a fruitless undertaking, in this country—where the freedom of speech and the press is so fully recognized, and so highly prized—to attempt to prevent judicial opinions from being as open to comment and discussion, as an opinion or treatise upon any other subject.   It is well, and fortunate that it is so.   This right is fully recognized in England, and it would be strange, if, under our institutions, we should be less tolerant.

To investigate and discuss the opinion of the court, and to disobey its mandates or orders, are quite different things.   All men may rightfully make their comments, but none should disobey, except upon pain of suffering the penalty attached for the violation.   And should those thus commenting, leave the subject, and impute dishonesty or base motives to the judge, he may be punished by indictment, for a libel—he may be answerable in damages in a civil action—or he may be liable to both prosecutions.

As to the acts of the respondent, it will be observed, that, except in relation to his comments, and the publilication made of the proceedings in his own case, on the first hearing, his articles had reference entirely to cases that were not before the court.   The cases of Abrahams and Boke had been adjudicated, and appealed to this court. As already stated, there was no rule, general or special, prohibiting the publication of the speeches of counsel, remarks of the court, or giving a statement of the proceedings on the first investigation.   And, without referring to the effect of making the publication, if there had been such rule, it is sufficient to say, that it could not, under the circumstances of this case, amount to a contempt.

It is insisted, however, that the courts of this State may punish other acts and omissions as contempts, than those mentioned in the Code.   We are strongly inclined to think, however, that the provisions of the Code upon this subject, must be regarded as a limitation upon the power of the courts, to punish for any other contempts.   We can conceive of no possible state of case, in which the exercise of

this power might become necessary for the protection of the court, or the due administration of the law, that is not covered by these provisions.   If such a case should, by possibility arise, we would not say that, by virtue of its inherent power, the punishment might not be inflicted.   It is sufficient to say, however, that this is not one of those cases.  The newspaper articles of the respondent, may have been never so unjust—his strictures and censures have been never so malignant and libellous—and yet, in our opinion, they, in no proper legal sense, under the circumstances, amounted to contemptuous or insolent behavior towards the court, nor were they so calculated to impede, embarrass or obstruct the court in the administration of the law, as to justify the respondent's punishment in this summary method.

Judgment reversed.