No. 12,936.

## CHEADLE v. THE STATE.

CONTEMPT.—*Inherent Power of Courts.—Legislative Regulation.*—The power .to punish for contempts, and to determine what is a contempt, is inherent in courts of superior jurisdiction; the Legislature can not prevent the one or abridge the other, but it may enlarge the powers of the courts in these respects and regulate the procedure.

SAME.—*Indirect Contempt.—Publication Concerning Pending Cause.—General Rule.*—The general rule is, that any publication, relating to a pending cause, which tends to prejudice the public as to its merits, and to corrupt or embarrass the administration of justice, including reflections on the court or its proceedings, or on the parties, jurors, witnesses, or counsel, may be visited as a contempt.

SAME.—*Construction of Section 1009, R. S. 1881.*—Section 1009, R. S. 1881, defining indirect contempts, properly construed, does not change the general rule, and a publication to amount to a contempt must not only be false or grossly inaccurate, but it must be so to the extent of prejudicing the public as to the merits of a cause, and of either corrupting or embarrassing proceedings then pending or thereafter to ensue.

SAME.—*Newspaper Comments Concerning Past Proceedings.*—Newspaper comments, however stringent or libellous, having relation to proceedings which are past and ended, are not in contempt of the authority of the court to which reference is made.

SAME.—*Punishment.—Publication Should be Clearly Contemptuous.*—The power to punish for contempt should be exercised promptly in proper cases ; but being in some respects arbitrary, it should be kept within prudent limits, particularly in regard to indirect contempts, and punishment ought not to be inflicted for publications which are not clearly contemptuous.

SAME.—*Rule to Show Cause.—Motion to Discharge.—Sufficiency of Information.—Practice.*—The sufficiency of an information charging a contempt is tested by a motion to discharge the rule to show cause, on the ground of alleged insufficiency of the facts upon which it was entered.

From the Clinton Circuit Court.

*J. G. Adams, W. R. Stokes* and *H. C. Sheridan*, for appellant.

*W. A. Staley*, for the State.

NIBLACK, J.—On the 14th day of December, 1885, the prosecuting attorney of the Forty-fifth Judicial Circuit filed in the Clinton Circuit Court an information, supported by

his oath, charging that Joseph B. Cheadle was the editor and proprietor of a newspaper of general circulation, known as the "Frankfort Banner," printed and published in the county of Clinton, in this State, and that there was then pending, and undisposed of, in said court, a cause entitled "The State of Indiana against James A. Spurlock," in which the defendant Spurlock was charged with an assault and battery with intent to commit murder; that the said Spurlock was then confined in the jail of said county, upon the charge so pending against him; that the said Cheadle did, on the 12th day of December, 1885, print and publish in his said newspaper at the city of Frankfort, in which said court was then in session, a certain false, scurrilous and malicious article concerning said cause and the court in which, and judge before whom, the same was pending, as follows:

## "A JOKE ON A JUDGE."

"One of the cases that has taken up the attention of the court this week is that of the State *vs.* James A. Spurlock, for an assault with intent to kill. The case was called, a jury impanelled, and the prisoner was arraigned, pleaded not guilty, and the State had nearly concluded its evidence, when the court adjourned, Wednesday night. Mr. Spurlock said he must go home; his attorneys urged and insisted that he must remain. Finally he told them that it was absolutely necessary for him to go—that he had no money with which to pay his hotel fare, and he must go, but that he would be back by 8 o'clock in the morning, and he went. He went and overslept himself and did not get back in time. The case was called at the usual time for opening court and the trial proceeded. After a while the judge noticed that the defendant was not present and asked where he was. The attorneys informed the court of the facts, and asked that the case proceed, notifying the court that they would waive all questions that might arise until he came in, but the court said, 'No, we will wait awhile,' and

it did. Spurlock had overslept himself and did not get an early start, and the road was rough, and as he had to walk, made slow progress, but all the time he was coming with the perspiration streaming from every pore, yet the court could not know these facts and became restive. Senator Kent, who had faith in Spurlock's return, begged for time. Bristow, majestic in size and strong in the confidence of his client, said: 'Your Honor, there is a good cause for his absence; he will surely come.' D. J. McMath, quiet and firm, urged delay and said he knew Spurlock would not desert him. The judge lost his temper—lost it bad—and intimated that the attorneys had spirited him away. Kent arose wrathful, yet calm, and in dignified manner informed his Honor that his client had gone home against his advice and over his protest, and that his Honor had no right to expect him as attorney to handcuff and imprison his clients in order to keep them in court. Then came a talk about the bond, and the judge declared it was of no value, and in the meantime poor Spurlock was walking for life to reach the court-house—more words between the counsel and the judge—more intimations that they were responsible, and all the time the judge became more nervous. Finally the attorneys concluded that Spurlock might have gone, and all the time Spurlock, like Sheridan, less than three miles away and walking for life.

"The judge read the attorneys a lecture; they apologized. The State attorney assured the court that he had the fullest confidence in the statements of the attorneys for the prisoner on trial, and yet the court could not see poor Spurlock in his famous walk less than two and a half miles away. Having been accused wrongfully, the attorneys for the prisoner decided to withdraw from the case, and did so. At this point the court called the jury, thanked them for their courtesy, and discharged them, and ordered the sheriff to call the defendant and his bondsmen on the recognizance bond, and as the sheriff shouted 'Bring in the body of James A. Spurlock and save your recognizance,' away over the hills to the

east, and stepping just three feet and two inches to the step, with every muscle strained to the highest tension, and walking for life, came James A. Spurlock, only two miles away, in his now famous walk to the court-house, December 10th, 1885.

"Having discharged the jury, forfeited the bond, the judge had a bench warrant issued, and instructed the sheriff to go quickly and be prepared for business, and to bring into his presence the body of James A. Spurlock, not to spare expense, and that the court would foot the bill; and then there was 'hurrying to and fro,' deputies 'to the right of him,' deputies 'in front of him,' deputies 'behind him,' deputies 'to the left of him.' How grandly marched these deputies into the vortex of danger; all of them, into the county's purse, rode they, while just beyond the city limits, with rapid pace and earnest face, all unconscious of the affray, marched in broad daylight, down a public road—Spurlock, the hunted. No one can tell just what mysterious path the deputies pursued, nor what momentous questions puzzled the brains of attorneys and judge, while through the open gates of the city, came all covered with dust, and with bated breath—Spurlock, the hunted. He paused not at the iron bridge, the public square he crossed, and into the court-house he went; through its great broad corridors he strode, up the stairway and into the court-room, unmindful of the fact that everywhere there were hurrying steps and mounted deputies armed to the teeth, scouring the country far and near, for—Spurlock, the hunted. He quietly sought his chair near by the place where the jury, solemn and quiet, sat but yesterday. He looked in vain for jury and judge, for attorneys and friends, but, alas! there were none; and so sat Spurlock for quite awhile, wondering what could have sent them away. After a time he sought and found his attorneys, and a scene ensued. Finally a deputy approached him meekly, and asked him if he was ready. Ready for what? said Spurlock. Ready to go to jail. The ignorant fellow said he did not know what he was to go to

jail for—neither does any one else; but they marched him there. His attorneys prepared the papers to take him out on a writ of *habeas corpus*, and when they went to the jail to have him swear to them he still did not know that he was arrested. The judge granted the writ, and set the trial down for next Monday.

" The Banner will ask, why is this man kept in jail until next Monday? There is no more authority for putting this man in jail than there is the President. He was on trial, in jeopardy. He went home because he had no other place to go, nor money to buy a place to stay. He overslept himself, and did not reach the court-house in time. His attorneys pleaded to let the trial go on. The court no doubt thought it a ruse, and finally discharged the jury. When he did that, at that moment Spurlock stood acquitted; the bond became inoperative, and the forfeiture of the recognizance was absolutely void, and his incarceration in jail illegal. It is simply an outrage to keep him there. No matter how guilty he may have been, he stands free, and it is no fault of his—no fault of his attorneys. He was not trying to get away, but walked nearly fifteen miles, hurriedly, to get back to his trial. The Banner, on behalf of all the people, denounces his incarceration in jail, and begs the court to obey the law, and set him free. The people have just as much right to put the judge in jail as he had to order Spurlock sent to jail. This is the law, and the law should be obeyed."

The information further charged, that the publication of said article interrupted and embarrassed the proceedings in the cause to which it related, and the administration of justice in said court, imputing, as it did, to the court, and to the judge thereof, wrongful, dishonest and corrupt conduct in causing the imprisonment of Spurlock as stated ; also, that said article contained many falsehoods and gross inaccuracies ; that what was said in relation to the conduct of the sheriff and his deputies in re-arresting Spurlock was false, as was

VOL. 110.—20

Cheadle v. The State.

also the statement that the sheriff made no effort to re-arrest Spurlock until he came into the court-room; that the statements that the judge intimated that the attorneys for Spurlock had spirited him away, that the judge declared that Spurlock's bond was of no value, that the judge read the attorneys a lecture and they apologized, that Spurlock's attorneys begged that the trial might go on, and that the judge lost his temper bad, were all, also, false; that said article contained many other false and defamatory statements which tended to defeat the punishment of criminals, to degrade the court, and to bring the enforcement of the law into disrepute. Wherefore it was further charged that Cheadle had been guilty of a wilful contempt of the authority of the court.

A rule was thereupon granted against Cheadle to show cause why he should not be attached and punished for the supposed contempt so committed by him. Cheadle, appearing, moved to discharge the rule, for the alleged insufficiency of the facts upon which it had been entered, but his motion was overruled. No final action upon the rule having in the mean time been taken against him, Cheadle, on the 16th and 19th days of said month of December, 1885, respectively, published additional articles in his newspaper, as follows:

"James A. Spurlock was still in jail this morning. The most sacred writ known to the law is that of *habeas corpus*. It is always made returnable at once. James A. Spurlock is a poor man, and can not move the powers to be to act. The Banner, as the advocate of the people, declares against the great wrong of keeping him in jail. The time will come, and in the near future, when it will be seen and known that the only true security is in the quick and fearless execution of the laws."

Also, the following: "The writ known as that of *habeas corpus* is the most sacred writ known to the law. Persons, who are conversant with history, have read about the 'Star Chamber proceedings,' where men and women were imprisoned and never given a trial—never knew why they were

imprisoned. Then there came contests, and blood flowed in great waves, and 'Magna Charta' came as the great boon of the people. Personal liberty is priceless. Great wars have grown out of the withholding the personal liberty of a single individual. The writ of habeas corpus, by which personal liberty is secured, when one is unlawfully or unjustly imprisoned, has always been made returnable immediately, and has always had precedence over all other forms of cases. There are no exceptions to this rule, and because this is true, and because it is of vital importance to the peace, prosperity and happiness of the people that personal liberty be held above all price, the Banner has referred to it. So long as the present editor has charge of it, it can always be depended upon as a fearless advocate of the right, as its editor is given to see the right, and it will, at all times, demand the enforcement of the laws."

On the 22d day of the same month, the prosecuting attorney filed under oath what was termed a supplemental information, charging that these last named articles reflected upon the integrity of the court, and were, as well for that as for other reasons assigned, in further contempt of the authority of the court. Upon the filing of this supplemental information, another rule was granted against Cheadle to show cause why he should not be also attached and punished for the publication of the articles lastly above set out, and a subsequent motion to discharge that rule was also overruled.

Cheadle then answered that the publications referred to were made by him upon what he regarded as reliable information, and in the belief that the prosecution against Spurlock had, in legal effect, terminated by the discharge of the jury under the circumstances attending its discharge, and that hence the subsequent imprisonment of Spurlock upon the original charge against him was wholly without authority in law, and in the further belief that all the facts therein stated, which could be fairly understood as seriously asserted, were substantially true; that such publications, in addition to be-

ing items of news, were intended as, and only designed to be, fair criticisms upon what he considered an inadvertent error of the court, and what he still believed was an erroneous proceeding, disclaiming, at the same time, any intention of imputing corrupt motives to the court or any of its officers, or of interrupting or in any manner obstructing the administration of justice.

The court, not regarding the answer of Cheadle as sufficient to constitute a defence to the charges against him, adjudged him to have been guilty of an indirect contempt of its authority, assessing a fine of fifty dollars against him, and requiring him, in addition, to pay the costs of the proceedings so taken against him.

The statute defining the powers and duties of circuit courts provides that "The said circuit courts, respectively, shall have full authority to administer all necessary oaths, and to punish, by fine and imprisonment, or either, all contempts of their authority and process in any matter before them, or by which the proceedings of the courts or the due course of justice is interrupted." R. S. 1881, section 1322.

It is elsewhere enacted that "Every person who shall falsely make, utter, or publish any false or grossly inaccurate report of any case, trial, or proceeding, or part of any case, trial, or proceeding thereof, shall be deemed guilty of an indirect contempt of the court in which such case, trial, or proceeding may have been instituted, held, or determined, if made at any time after such proceeding shall have been commenced, and at any time while the same is pending, and while the court shall have jurisdiction thereof, and at any time before it shall be fully determined and ended; or, if such report shall be so made pending such case, trial, or proceeding, touching any ruling, or order of said court therein, such person shall be deemed guilty of an indirect contempt of the court making such ruling or order." Section 1009, R. S. 1881.

This last statutory provision is in its nature cumulative only, and does not exclude other methods of committing in-

direct or constructive contempts of the authority of courts. It was held in the case of *Little* v. *State*, 90 Ind. 338 (46 Am. R. 224), that the power to protect itself from contempts, and also to determine what is a contempt, is inherent in every court of superior jurisdiction, and that it is not in the power of the Legislature to prevent the one or to abridge the other. 2 Bishop Crim. Law, section 243. But the Legislature may aid the jurisdiction or enlarge the power of the courts in those respects by declaring certain improper conduct to be a contempt which has not theretofore been so regarded and treated, and may regulate the practice in proceedings against persons for an alleged contempt. *State* v. *Morrill*, 16 Ark. 384; *Worland* v. *State*, 82 Ind. 49.

It may be said, generally, that any wilful act tending to obstruct, interrupt, or embarrass the proceedings of a court, or to corrupt or impede the due administration of justice, is a contempt of the authority of the court against which such wilful act is directed.

As regards indirect or constructive contempts, resulting from improper publications, Bishop, *supra*, in vol. 2, section 259, states the general doctrine to be, that any publication, whether by parties or strangers, relating to a cause in court, which tends to prejudice the public as to its merits, and to corrupt or embarrass the administration of justice, may be visited as a contempt, and this includes reflections on the tribunal or its proceedings, or on the parties, the jurors, the witnesses, or the counsel. *Ex parte Wright*, 65 Ind. 504.

In the light of this general doctrine, which is well supported by the authorities, section 1009, of the statutes, above set out, ought to be construed as meaning that every person who shall falsely make, utter or publish any false or grossly inaccurate report of any case, trial or proceeding, or part of any case, trial or proceeding thereof, *tending to prejudice the public as to its merits, and to corrupt or embarrass the administration of justice*, shall be guilty of an indirect contempt, etc. The publication must, therefore, not only be false, or grossly

inaccurate, but must be so to the extent of prejudicing the public as to the merits of the cause referred to, *and of either corrupting or embarrassing* the proceedings then pending and thereafter to ensue.

The general rule is, that to constitute any publication a contempt, it must have reference to a matter then pending in court, and be of a character tending to the injury of pending proceedings upon it, and of the subsequent proceedings. Rapalje Contempts, section 56.

While the phraseology of the section of the statute in question is, possibly, in that respect, somewhat obscure, it contains nothing, as we construe it, changing that general rule. It follows, therefore, that comments, however stringent, which have relation to proceedings which are past and ended, are not in contempt of the authority of the court to which reference is made. Such comments may constitute a libel upon the judge, or some other officer of the court, but can not be treated as in contempt of its authority. *Dunham* v. *State*, 6 Iowa, 245 ; *State* v. *Anderson*, 40 Iowa, 207 ; *Stuart* v. *People*, 3 Scammon, 395 ; *People* v. *Wilson*, 64 Ill. 195 (16 Am. R. 528) ; *Storey* v. *People*, 79 Ill. 45 (22 Am. R. 158) ; *Bayard* v. *Passmore*, 3 Yeates, 438 ; *In re Bronson*, 12 Johns. 460 ; *Respublica* v. *Oswald*, 1 Dallas, 319.

At common law the courts possessed the power of punishing, as for a contempt, libellous publications upon their proceedings, whether pending or past, but in this country the courts are more circumscribed in their jurisdiction in that respect, and their power to punish is confined to publications concerning pending cases. *State* v. *Morrill, supra.*

As will appear by a reference to the information first filed, the alleged falsity of the publication therein set out consisted of statements : *First.* As to the manner in which the sheriff and his deputies re-arrested Spurlock. *Second.* That the sheriff made no effort to re-arrest Spurlock until he came into the court-room. *Third.* That the judge intimated that the attorneys for Spurlock had spirited him away. *Fourth.*

That the judge declared that Spurlock's bond was of no value. *Fifth.* That the judge read the attorneys a lecture and they apologized. *Sixth.* That Spurlock's attorneys begged that the trial might go on. *Seventh.* That the judge lost his temper, and lost it badly.

These statements had reference entirely to past occurrences, merely incidental in their nature, and not involving in any way the merits of the prosecution against Spurlock. The statements as to what the sheriff and his deputies either did, or failed to do, had no application to any proceeding in court either present or past.

To say of a judge, when referring in a newspaper article to the former and then past trial of a cause, that he lost his temper badly, can not be fairly construed as tending to interrupt or impede any present or future proceeding in the cause, and hence could not amount to a contempt of the authority of the court in which the trial occurred. Such a statement, whether falsely or truthfully made, might tend to vex and annoy a judge, but it would not rise to the grade of either a libel or a contempt. For these and similar reasons, we feel constrained to hold that none of the statements specifically charged to have been falsely made constituted, in any proper sense, a contempt of the authority of the Clinton Circuit Court. We may say the same as to the entire article of which these statements formed a part. It, as a whole, referred only to past proceedings, including the re-arrest of Spurlock. Upon the undisputed facts contained in the article, it was a legitimate subject of discussion whether the discharge of the jury, referred to in it, did not in law operate as an acquittal of Spurlock. *Wright* v. *State*, 5 Ind. 290; *Morgan* v. *State*, 13 Ind. 215; *Maden* v. *Emmons*, 83 Ind. 331; *Adams* v. *State*, 99 Ind. 244.

The publications set out in the second or supplemental information were in a sense sharp criticisms upon the assumed delay of the court in taking action upon Spurlock's application for a writ of *habeas corpus*, but they, in the same con-

nection, announced some general truths, not offensive to any court, and applicable alike to all similar cases.

The statement that Spurlock was a poor man and could " not move the powers *to be* to act," was a statement of doubtful meaning, in the connection in which it was used, and capable of a construction alike offensive to the court and to all concerned in Spurlock's imprisonment; but, in view of the common understanding that men with means possess many legitimate advantages which are not within the reach of men without means, and can hence more readily com- mand the assistance they may need in times of peril, we would not feel justified in inferring that Cheadle, in making the statement, intended to impute either corrupt or merce- nary motives to the court. The reference to the " powers *to be*" was not, in any event, a reference capable of any very definite application, and was, in a strict sense, a meaning- less phrase.

There are cases on record from which an inference might be drawn that the statement in question constituted a con- tempt, as it was doubtless considered in this case, but it must be borne in mind that the force of public opinion in this country, in favor of the freedom of the press, has of late greatly restrained the courts in the exercise of their power to punish persons for making disrespectful and injurious publi- cations. In many jurisdictions statutes have been enacted depriving, or assuming to deprive, the courts of their power in that respect. Rapalje, *supra*, section 56. Such a statute, as applicable to the courts of the United States, was enacted by Congress on the 2d day of March, 1831. R. S. of the United States, section 725.

While the power to punish when contempts are really com- mitted is one which ought to be exercised promptly in proper cases, yet it is, in many respects, an arbitrary power, and hence one which ought to be kept within prudent limits. This is particularly the policy of the law in regard to indirect con- tempts. *Haskett* v. *State*, 51 Ind. 176. No one ought to be

found guilty upon a doubtful charge of indirect contempt, and especially so in a case in any manner involving the freedom of the press.

It is true that too often, under the guise of a guaranteed freedom, the press transcends the limits of manly criticism, and resorts to methods injurious to persons and tribunals justly entitled to the moral support of all law-abiding citizens; but such digressions are not always unmixed evils, and it is only in rare instances that legal proceedings in repression of such a license can, with propriety, be resorted to.

When such a digression becomes too flagrant to be disregarded, a prosecution for libel is usually the most appropriate and effective remedy. In such a prosecution both parties go before a jury of the country on terms more nearly equal than they can relatively occupy in a proceeding for the punishment of an alleged contempt. *Stuart* v. *People, supra.*

These considerations lead us to the further conclusion that neither one of the publications, herein above lastly referred to, constituted a contempt of the authority of the Clinton Circuit Court within the meaning of the statutes and of the authorities cited.

In a case like this, a motion to discharge the rule to show cause, entered in the first instance, tests the sufficiency of the information upon which the rule was based. 4 Blackstone Com. 286; *McConnell* v. *State*, 46 Ind. 298; 2 Works Pr., section 1375.

Voluminous as they are, we have set out the publications considered in this case *in extenso* simply because we have regarded it as impracticable to make a synopsis of them which would fully display their general scope and character, and intelligibly present all the points made upon them.

The judgment is reversed, and the cause remanded, with instructions to discharge the appellant.

Filed April 5, 1887.