Statement of the Case.
MONROE, J.
Relator complains that he-was ruled into court for contempt, alleged to consist in the writing and delivery to the counsel for the plaintiff in the above entitled suit of a communication reading as follows::
“March 7th, 1906.
“Messrs Saunders & Gurley, Attorneys— Gentlement: In the matter of Mrs. Anna Fell-man, widow, v. Mercantile Fire & Marine Insurance Company, we hand you check, in ayment of the judgment, for $595.45, plus-3.49 additional, interest. We-do this by instruction, under protest, for no amount is due- or has ever been due. By some mischance, or mistake, or worse, the court has been prevailed on to give a decree [assuming the correctness of your contention as to the demolition of certain walls] for about three times the amount of the loss. Shortly after the fire-damage we made repairs in strict accordance *726 with the city engineer’s instructions, and turned the building over in better condition than before the fire. By the remarkable decision you [your client] make a net profit of every cent the companies pay, which is on a basis of $3,272.72. The specifications have disappeared from the record; moreover, they were made without regard to the fire damage, and the builder, who made the estimate [for his principal], on which the judgment is based, and whom you interviewed [he does not appear as a witness] told you that about $1,000 of his estimate belonged and should be charged to the Uthoff building adjoining. This is to put you on notice that we shall endeavor, by proper procedure, to reopen this matter, and to have repaid to the company above named the sum that is now extorted under the judgment.
“Yours respectfully,
“Wm. A. Cook, President.
“P. S. One check is made to cover both judgment and interest for $3,593.64.”
Relator alleges that he appeared in answer to the rule (which also embraced, a demand for the payment of certain costs) and, disclaiming any contempt of the court or any contemptuous act, excepted to the proceeding, on the ground that the court was devested of jurisdiction, by Act No. 190, p. 242, of 1894, to punish the act complained of as contempt, but that the exception was overruled, and that he was declared guilty and sentenced to pay a fine of $50, and be imprisoned for 10 days. He alleges that the court thereby exceeded its jurisdiction, that, as appears upon the face of the papers, the matter complained of did not in any way affect the court or its process, and (after some further allegations to the same effect) he prays for a writ of prohibition to restrain the execution of the judgment.
To the rule nisi and restraining order issued in the case, the judge a quo makes return in substance, as follows: that it is true that relator was ruled into court for contempt, and excepted to the jurisdiction of the court, as alleged by him, and that respondent, after hearing, overruled the exception and rendered the judgment complained of; that the sole ground upon which the exception was based was that respondent’s jurisdiction has been devested by Act No. 190, p. 242, of 1894, but that though said act appears among the published Statutes of the year 1894, the official journals of the,. House of Representatives for that year show that it never became a law, for the reason that it was vetoed by the Governor, and was never thereafter passed, over the veto; the fact being, that the bill was delivered to the Governor for his signature on July 3d, and was returned, with his veto, on July 9th, and the Judiciary Committee of the House of Representatives having reported that, because it had not been returned within five days, it had become a law, without the signature of the Governor, no further action was taken by the General Assembly concerning it, but that, in fact and in law, the veto was effective, because the House of Representatives adjourned over from Saturday July 7th to Monday, July 9th, and the intervening Sunday did not count in computing the delay.
Respondent further returns that the bill in question would have been unconstitutional, if adopted, in that Article 166 of the Constitution, under the authority of which it was adopted, was intended to authorize the General Assembly to limit the penalty which might be imposed for contempt, but not to-'authorize the regulation of contempt, in general, or the defining of what acts should constitute contempt, and that it is essential to the proper exercise of their functions that courts should be free to determine such question, and that apart from the statute in question respondent was vested with jurisdiction in the matter at issue, and, having jurisdiction, his action is not reviewable in these proceedings.
It is conceded and the official journal of the House of Representatives for 1894 shows that the bill in question, having passed both houses of the General Assembly, was delivered to the Governor for his signature on July 3, 1894; that it was returned by him *728 with his reasons for refusing to sign it or veto message, on July 9th; that July 8th •vyas Sunday; and that the House of Representatives had adjourned from the day before (Saturday) until the day following (Monday) ; that the veto message was referred to the judiciary committee of the House of Representatives, which committee reported that the bill had become a law before the veto message was received, by reason of the fact that the message had not been received within five days from the day upon which the bill had been presented (and delivered) to the Governor, and, hence, came too late; and that, thereafter no further action was taken by the General Assembly in regard to said bill.
Opinion.
Article 76 of the Constitution provides, inter alia, that:
“If any bill shall not be returned by the Governor within five days after it shall have been presented to him, it shall be a law in like manner as if he signed it, unless the General Assembly, by adjournment, shall prevent its return, in which case it shall not be a law.”
We concur in the view expressed by the Judiciary Committee in its report to the House of Representatives that it is the adjournment of the “General Assembly,” and not of one branch of the General Assembly, which relieves the Governor of the necessity of sending in his veto within five days, in order to make it effective. But we have heretofore in a carefully considered case, taken a different view than that expressed by the committee of the' question whether, in computing the delay allowed the Governor, Sundays are or are not to be considered. In the case referred to it was said by Blanchard, J., as the organ of the court:
“There is a rule of general, though, perhaps not of universal acceptance, that where a limitation of time is fixed within which a particular act or thing is required to be done, if done at all, after which performance or the doing of the I thing would he of no effect, that if the time exceed a week an intervening Sunday is to be included in the computation, if less than a week, Sunday is to be excluded. 26 A. & E. Ency. of Law, p. 10; Haley v. Young, 134 Mass. 366; Anonymous, 2 Hill (N. Y.) 375; Thayer v. Felt, 4 Pick. (Mass.) 354; Hannum v. Tourtellott 10 Allen (Mass.) 494; Cunningham v. Mahan, 112 Mass. 59. * * * The federal Constitution allows the President of the United States 10 days, Sundays excepted, to return a bill. * * * Many of the states of the Union allow 10 days, Sundays excepted. Some allow a less number of days, Sundays excepted, and others a less number of days without mentioning Sundays. Where there has been an omission to mention Sunday in the constitutional provision, and cases have gotten into the courts, no authoritative announcement of the rule has been laid down, so far as our research has extended. Indeed, no decision covering the exact case has been discovered anywhere. * * * It would seem that since the earlier Constitutions of this state expressly excepted Sunday and the later Constitutions did not, the intention was that Sunday should be counted in the five days allowed the Governor. But this first impression is obliterated when we consider the general rule above referred to. Under the operation of that rule, had not the framers of the [earlier] Constitutions expressly excluded Sundays from the computation, in the 10 days given the Governor, the Sundays would have been counted; whereas, since, in the later Constitutions, five days only are allowed, a time which does not necessarily include a Sunday, that day [Sunday], happening to be one of the five days, is excluded from the count. Where the time stipulated is such that it does not necessarily include Sunday, Sunday is excluded from the computation without express mention of the fact. Where the time stipulated must necessarily include Sunday, to exclude that day from the computation there must be an express declaration to that effect. Such is the effect of the general rule laid down, and the framers of the several Constitutions under which the state has been governed are presumed to have intended the language and phrases used -in accordance therewith.”
And agreeably to the views thus expressed, it was held that the act under consideration had been returned within five days—a Sunday being excluded from the computation—and that it failed to become a law because it was not passed over the veto which accompanied it. State ex rel. Pharmaceutical Ass’n v. Michel, 52 La. Ann. 936, 27 South. 565, 49 L. R. A. 218, 78 Am. St. Rep. 364.
Adhering to the ruling thus stated, we conclude that Act No. 190, p. 242, of 1894, *730 did not become a law, because vetoed by tbe Governor and not passed over tbe veto.
Counsel for relator argue that even though the act of 1894 be unconstitutional the penalty imposed was unauthorized because the writing of a private letter concerning a judgment which has been rendered and executed, be the terms of the letter what they may, is not an act which can be dealt with by the court rendering the judgment as a contempt, and in this position we believe the counsel to be sustained by authority.
Contempts are defined to be:
“(1) Direct, such as are offered in the presence of the court while sitting judicially; or (2) constructive, such as, though not in its presence, tend to embarrass the due administration of justice.”
The authorities are, in the main, agreed that anything done or said in or out of the presence of the court, which impedes or obstructs it in the decision of a “pending case,” or in the execution, by authorized means, of its judgments, may be punished as contempt, but, quoad a case, which has been decided and the execution of the judgment in which is not hindered, a different rule obtains, which is stated as follows:
“A slanderous and libelous publication concerning the judge in relation to an act already done, or a decision already rendered, cannot be punished by the court as a contempt. However criminal the publication may be, it lacks that necessary ingredient to constitute a contempt, of tending to prejudice the cause or to impede its progress.” A. & E. Ency. of Law (2d Ed.) vol. 7, p. 61, citing Ex parte Barry, 85 Cal. 603, 25 Pac. 256, 20 Am. St. Rep. 248; Storey v. People, 79 Ill. 45, 22 Am. Rep. 158, People v. Wilson, 64 Ill. 195, 16 Am. Rep. 528; Cheadle v. State, 110 Ind. 301, 11 N. E. 426, 59 Am. Rep. 199; Dunham v. State, 6 Iowa, 245; State v. Anderson, 40 Iowa, 207; Rosewater v. State, 47 Neb. 630, 66 N. W. 640; State v. Kaiser, 20 Or. 50, 23 Pac. 964, 8 L. R. A. 584; Bayard v. Passmore, 3 Yeates (Pa.) 438.
In State ex rel. Ashbaugh v. Circuit Court (Wis.) 72 N. W. 193, 38 L. R. A. 559, 65 Am. St. Rep. 90, it appeared that the judge of the circuit court was a candidate for re-election, and that the alleged eontemnor had issued a publication charging him with partiality and corruption in the trial of certain causes which had been decided by him and had been sentenced for contempt. In passing upon the question of the legality of the sentence, the Supreme Court of Wisconsin said:
“A criminal contempt at common law may be generally defined as any act which tends either to obstruct the cause of justice or to prejudice the trial of any action or proceeding then pending in court. The power of courts of superior jurisdiction created by the Constitution to punish such acts is necessarily inherent in such courts, and arises by implication from the very act creating the court. A court without the power would be at best a mere debating society. * * * Doubtless, this power may be regulated, and the manner of its exercise prescribed by statute, but certainly it cannot be-entirely taken away, not can its efficiency be so impaired or abridged as to leave the court without power to compel the due respect and obedience which are essential to preserve its character as a judicial tribunal. The decisions on this point are well nigh unanimous. * * * In the present case it is of the utmost importance to bear in mind that Judge Bailey was a candidate before the people for re-election. Had he been a candidate for any other office, it would not be contended by any one that the publication would afford ground for any other legal action than an action for libel in the regular course of law; but the claim is that because he was a judge, and was holding court at that time, such unfavorable criticism of his past action may be summarily punished by the judge himself for contempt. * * * The result of such a doctrine is that all unfavorable criticism of a sitting judge’s past official action can be at once stopped by the judge himself, or, if not stopped, can be punished by immediate imprisonment. * * * Under such a rule the merits of a sitting judge may be rehearsed, but, as to his demerits there must be profound silence.”
And the relator was discharged.
We are of opinion that the views thus expressed are sound and that they apply with greater force to a private communication than to a publication which is distributed broadcast. If this be not so, it would be difficult to fix any limit to the judicial power in the matter of contempt, and remarks made in the most casual conversation, or expressions used in letters from one person to another concerning litigation long terminated might be made the subject of proceedings for contempt; a condition which, it *732 seems to us, is wholly unnecessary for the protection of the judiciary, and wholly inconsistent with the exercise of the constitutional right of free speech. There is an obvious reason which appeals to the common sense of mankind, why outside influences should not be allowed to interfere with the conduct and decision of a cause or with the execution of a judgment, and that is that every individual, whether he be prosecuted criminally or be a litigant in a civil action, is guaranteed, by the fundamental law, a trial according to law, and protection by and under the law, for life, liberty, and property, and he is denied those rights just as certainly as one who is hanged by a mob is denied them, if every interested, meddlesome, or malicious person who may choose to do so is allowed to intimidate his witnesses, corruptly influence the jurors to whom his case is submitted, denounce the judge for his rulings as the trial progresses, and obstruct the execution of the judgment when obtained. But when the ease of the criminal or litigant has been fairly and finally tried, and the judgment rendered and executed, and the court has no longer any function to discharge in the matter, or when the act or speech charged to ■ be in contempt in no manner hinders or obstructs the court in the discharge of its functions, it would be, we think, going further than either law or reason require to hold that the wisdom and propriety of the court’s action and methods are beyond either public or private criticism. Aside from these considerations it is, perhaps, safe to say that in a large proportion of cases decided by the courts, the losers entertain and express unfavorable opinions of the judge; for as “no thief e’er felt the halter draw, with good opinion of the law,” so, the average individual who is convinced of the justice of a cause which he loses is apt to entertain a poor opinion of the other who differs from him, and such poverty becomes destitution .if the opinion of the other produces a loss as its practical , result. This is human nature, and as the loser is not always in the wrong in his opinion, so his criticism is not always unjust, and may produce a wholesome and tonic effect rather than a prejudicial one, so far as the judiciary is concerned. In the instant case, the criticism was intemperate and ill-judged, though we do not deduce from it that the relator intended to charge the respondent with anything more serious than having been misled, and neither our learned brother, who has occupied his present position for many years, and who enjoys the confidence and respect of the community which he has so ably and conscientiously served, nor the body of the judiciary of the state, are likely to sustain any injury from the charge as made. The material point, however, is that the criticism was not made with reference to any pending case, but with reference to a ease that had been decided (not only by the respondent, but finally, by the Court of Appeal), and that it was made in a private communication from one individual to another, for which reasons, we think, it was beyond the reach of any proceeding for contempt. There are a number of cases in our jurisprudence in which it has been held that in order to authorize such proceedings, the court in which they are instituted must be interfered with in the exercise of its lawful jurisdiction. Thus, in State ex. rel. Liversey v. Judge, 34 La. Ann. 741, it was held that a proceeding for contempt would not lie for the violation of an injunction prohibiting the publication in a newspaper of an alleged libelous article. In State ex rel. Kane v. Lazarus, 37 La. Ann. 401, it was held that such proceeding would not lie to, punish a witness for answering untruthfully. In State ex rel. Anglade v. Judge, 48 La. Ann. 1414, 20 South. 912, it was held that a writ of fieri facias could not be enforced by pro *734 •cess for contempt. In Re State ex rel. Hero, 36 La. Ann. 352, the same ruling was made as to a writ of sequestration. In the first-mentioned case it was found that the court was without jurisdiction to issue the injunction, and in the other eases that the writs were authorized, but that proceedings for •contempt were not the proper means for enforcing their execution. In the instant case no writ or order had been issued, and the alleged contempt Was committed whilst the relator was in the act of satisfying a final judgment. Our conclusion, then, is that the proceeding against him was unauthorized.
It is therefore ordered, adjudged, and decreed, that the alternative writ herein issued be now made peremptory, and that the respondent judge be accordingly prohibited and restrained from further proceeding to exe•cute the sentence for contempt pronounced ■by him against relator.