## *In re* W. N. HICKEY.

### (*Knoxville.* September Term, 1923.)

1. CONTEMPT. Act held insufficient to include common law with respect to contempt.

   Shannon's Code, section 5918, subsecs, 1-5, prescribe the statutory grounds of contempt, and subsection 6, specifying "any other act or omission declared a contempt of law," added nothing to the previously enumerated acts and did not make the common law with respect to contempt applicable. (*Post, pp.* 372-374.)

2. CONTEMPT. Newspaper article held not contempt in "presence of court."

   Shannon's Code, section 5918, subsec. 1, providing that powers of the courts to punish contempts shall extend to the willful misbehavior of any person in the presence of the court or so near thereto as to obstruct justice, relates to direct personal misbehavior either in the courtroom or so near thereto as to interfere with court procedure, and cannot be extended so as to embrace the effect that a newspaper article published at some remote place might have upon the attendants on the court who happened to read it. (*Post, pp.* 372, 374.)

   Cases cited and approved: State v. Galloway, 45 Tenn., 329; Harwell v. State, 78 Tenn., 548; Scott v. State, 109 Tenn., 395; Coleman v. State, 121 Tenn., 10.

   Code cited and construed: Sec. 5918, subsecs. 1-5.

3. CONTEMPT. Abuse and interference with process of court's procedure refers to pending suits.

   Shannon's Code, section 5918 subsec. 4, extending to courts the power to punish for contempt for abuse or unlawful interference with the process or proceedings of the court, refers to proceedings in some pending suit and does not apply to suits that have been terminated or to general criticisms of the court. (*Post, pp.* 374-380.)

In re Hickey.

4. **CONTEMPT.** Publication of newspaper article criticizing circuit court judge not contempt.

Publication of a newspaper article, charging that the circuit judge was wholly unfit and incapacitated to hold court and that as a result the court had broken down and ceased to function, not relating to any pending suit nor questioning the integrity of the court, *held* not punishable under Shannon's Code, section 5918, as contempt. (*Post, pp.* 374-380.)

5. **CONTEMPT.** Disclaimer of intent good defense where contrary does not clearly appear.

Where publication of a newspaper article charged that a circuit judge was unfit and incapacitated to hold court and that as a result the court had broken down and ceased to function, defendant's positive disclaimer of an intention to question the integrity of the court was a good defense where contrary did not clearly appear. (*Post, pp.* 374-380.)

Cases cited and approved: State of Montana ex rel. Metcalf v. District Court, etc., 52 Mont., 46; In re Francis B. Hart, 104 Minn., 88; State v. Circuit Court, 97 Wis., 1; Patterson v. Colorado, 205 U. S., 463; parte Steinman, 95 Pa., 220; Field v. Thornell, 106 Iowa, 7; Cheadle v. State, 110 Ind., 301; In re Dalton, 46 Kan., 253; In re Cooke, 116 La., 723; Sturoc's Case, 48 N. H., 428; State v. Tugwell, 19 Wash., 238; State v. Bee Pub. Co., 60 Neb. 282; Myers v. State, 46 Ohio St., 489; Storey v. People, 79 Ill.; 45; In re Brown, 168 N. C., 417; People v. Green, 7 Colo., 237; Burke v. Oklahoma, 2 Okla., 499; State v. Sweetland, 3 S. D. 503; Dunham v. State, 6 Iowa, 245; In re Brown, 3 Wyo., 125; In re Snow, 27 Utah, 265; State v. McClaugherty, 33 W. Va., 250; State ex inf. v. Shepherd, 177 Mo. 205.

Cases cited and distinguished: Tate, Sheriff, v. State ex rel., 132 Tenn., 131; Ex parte Green, 46 Tex. Cr. R., 576; State of Oregon v. Kaiser, 20 Or., 50; State v. Anderson, 40 Iowa, 207; Craig v. Hecht, 44 Sup. Ct., 103.

6. **ATTORNEY AND CLIENT.** Act held sufficiently broad to embrace any case demanding suspension or disbarment.

Public Acts 1919, chapter 42, section 1, prescribing the grounds of disbarment from practice in state courts and prescribing penalties and procedure in disbarment cases, is sufficiently broad to embrace any cases demanding suspension or disbarment, and under subsection 5 power was conferred to punish defendants guilty of unprofessional conduct, dishonesty, malpractice, or any conduct which renders them unfit to be members of the bar commensurate with their offenses by either suspension or disbarment. (*Post*, pp. 380-385.)

Acts cited and construed: Acts 1919, ch. 42, sec. 1; Acts 1817, ch. 51, sec. 1; Acts 1821, ch. 66, sec. 3.

Cases cited and approved: Austin Case 5, Rawle, 205; State v. Pickle (unreported).

Case cited and distinguished: Ingersoll v. Coal Co., 117 Tenn., 304.

Code cited and construed: Sec. 5783 (S.).

7. ATTORNEY AND CLIENT. Acting within Constitutional rights in criticizing court did not render attorney unfit to practice.

An attorney at law who acts within his constitutional rights in criticizing the court would not be guilty of conduct such as to render him unfit to practice his profession. (*Post, p.* 385.)

8 ATTORNEY AND CLIENT. Statements of attorney made in private conversation held insufficient to warrant disbarment.

Statements of an attorney at law in private conversation, referring to the judge of the circuit court and his cousin as being "some combination" and that when the cousin moved his finger west the judge moved west, *held* insufficient to warrant disbarment. (*Post, pp.* 385-389.)

Case cited and approved: Stuart v. People, 3 Scam., 405.

9. ATTORNEY AND CLIENT. Publication of newspaper article criticizing circuit judge held insufficient to render attorney unfit to practice.

Notwithstanding that facts did not justify publication of a newspaper article by defendant charging that the circuit judge was

wholly unfit and incapacitated to hold court and as a result the court had broken down and ceased to function, such publication did not render defendant unfit to be a member of the bar. (*Post, pp.* 389, 390.)

FROM HAMBLEN.

Appeal from Circuit Court of Hamblen County.—Hon. Von A. Huffaker, Special Judge.

Phillips & Hale, Mitchell Long, Johnson & Cox, J. Pike Powers, Jr., and W. C. Corum, for Hickey.

J. Carl Lambdin, C. T. Rankin, E. E. Creswell and W. T. Kennerly, for relator.

Mr. Justice McKinney delivered the opinion of the Court.

This is a contempt and disbarment proceeding instituted at the instance of Hon. James L. Drinnon, judge of the Second judicial circuit of Tennessee, against W. N. Hickey, a practicing attorney at Morristown.

The case was heard by Judge Von A. Huffaker, sitting by interchange with Judge Drinnon, who adjudged the defendant in contempt, assessed a fine of $10 against him, suspended him from the practice of law in the courts of this State for a period of thirty days, and taxed him with the costs of the case.

Defendant duly excepted to the judgment of the trial court, prayed and was granted an appeal to this court, and has assigned numerous errors, which challenge the correctness of the judgment of the circuit court.

The specific charges alleged against the defendant were as follows:

"(1) That after the said James L. Drinnon was elected and qualified as judge of the Second judicial circuit, the defendant, W. N. Hickey, had boasted and circulated reports to the effect that he had been largely instrumental in the election of the said Drinnon, and that he had said to his clients and to those whom he hoped might become his clients that he, the said Hickey, having elected the said Drinnon, was in a position to get anything he asked of the court, and thereupon invited litigants to come forward and employ him; that he controlled the court, or words to that effect or import.

"(2) That in a case pending in the circuit court of Grainger county, presided over by the Honorable James L. Drinnon, and wherein the defendant, Hickey, was of counsel, and wherein the circuit judge had ruled on a motion for a continuance adversely to the wishes and desires of the defendant, Hickey, that the defendant, Hickey, had become 'furious' and had made derogatory statements about said ruling, and at various places and times had abused the court by reason of said ruling aforesaid, and that thereafter the said Hickey had failed to fraternize with the said Drinnon, or be friendly with him.

"(3) That about 'January, 1922,' the defendant, Hickey had 'in and about Morristown, Tennessee,' publicly and openly 'abused' the said James L. Drinnon by stating that the court was a farce and that the judge was unfit to be upon the bench, and that he was incompetent, 'or words to that effect,' and that the said Hickey was going to get rid of the said circuit judge.

"(4) That pursuant to the studied purpose to 'ruin and destroy' the said James L. Drinnon, the said Hickey had caused to be printed in the Morristown Evening Mail, a

newspaper published at Morristown, Tenn., an article or a statement as follows, to-wit:

" 'Our Circuit Court a Joke.

" 'In 1918 when James L. Drinnon was a candidate for circuit judge the lawyers of Morristown, with the exception of two, W. N. Hickey and Chas. S. Stephens, published a signed statement in which they declared Drinnon did not have the necessary qualifications to make a circuit judge. The Morristown lawyers among other things, said:

" ' "We should regard the election of Mr. Drinnon to the high office of circuit judge as unfortunate to the citizenship of this judicial circuit."

" ' "Love of our Profession, the good order of this circuit, and our zeal for the proper administration of justice compel us to make the above statement.".

" 'They said many other things along the same line. This statement was dated March 28th, 1918, and signed by M. C. McCanless, E. R. Taylor, Wm. A. Orr, Rufus M. Hickey, W. T. Coleman, Jno. R. King, and James A. Carriger. Other facts in the statement of these lawyers were that Mr. Drinnon had had but little practice; had never had an opportunity to develop himself as a lawyer and was practically without experience or practice. That these lawyers were right, and those who differed with them wrong; those who believed that on account of his being a young and healthy man he might develop into something were also wrong as has been shown by the way he holds courts.

" 'It is generally said in Hamblen county and all over the circuit that Judge Drinnon while on the bench has

never learned a thing; that he is lacking in judicial ability, that his courts drag, juries become disgusted and costs pile up. Civil litigation has practically stopped because he does not know how to try civil cases, and it has become necessary, to secure law enforcement, to have law enforcement societies formed for the purpose of protecting the public against violators of the law. The circuit court of Hamblen county has become a farce. Whenever the public speaks in disrespect of a Circuit Judge and gives him a nickname, and calls the attorney-general "peahead" it is time to call a halt.

" 'When Judge Henderson was circuit judge for this circuit, citizens went to the courthouse in great crowds to hear his charge to the grand jury. Judge Henderson defined the criminal laws in plain and simple language and enlightened the public. Civil cases never dragged and litigants were not eaten up with costs. Judge Henderson disposed of more business, civil and criminal, in one week when he was well than is disposed of by Judge Drinnon in four. As it is now on the Monday when court opens, there are ordinarily about a dozen people at the courthouse outside of the jurors and the court officers. Nobody attends court, whereas in times past the courthouse was full and deep interest was taken in the administration of the law. The sheriff and his deputies now have to run all over the county to even get a juror.

" 'At the November term of the circuit court, 1921, two little civil cases were tried. The court and jury stood around doing nothing the balance of the week. At the present term of the court two little civil cases were tried. One about a cow worth $75 that had been in court about two years, and the other about a hog trade. The court

stood adjourned part of Tuesday and Wednesday and the biggest part of the remainder of the week while there were nearly thirty civil cases on the docket demanding attention.

" 'It has come to the point where a lawyer cannot conscientiously say to his client, even when he has good cause of action, that he bring suit in the circuit court. He is compelled to tell him that he had better stay out of court and suffer the loss of money or bear the injuries he complains of rather than go into circuit court. If he wins he is eaten up with costs, his case delayed from term to term until he comes out worse off than if he had never gone into court.

" 'It has become glaringly apparent that Judge Drinnon is an utter failure. Everything drags. Jurors complain of the delay in the business of the court. They sit around and do nothing. The further truth is that Judge Drinnon is not competent to hold the circuit court and his attorney-general is as bad as he is. People call the Judge "Easy Mark' 'and "Limberneck." They call the attorney-general "Peahead." Costs in court have accumulated and cost bills have been approved to such an extent that the taxpayers are paying for nothing two or three times as much as they did when Hamblen county had a circuit judge. Hamblen county is not alone in this condition from general rumor. Courts have broken down, sentences are suspended and there is lack of respect for the law, respect for the judge, for the attorney-general and finally the citizens are being compelled to take things into their own hands.

" '(Paid Advertisement.)'

"That said article was published on March 22, 1922, at the instance and direction of the said Hickey with the intent to bring in disrepute and disgrace the said circuit judge, and that said article had been read by witnesses, jurors, and attendants upon the circuit court which was then being held in Dandridge, Jefferson county, Tenn., and that the administration of the law had been interfered with by reason thereof, and that it had hindered and obstructed the judge and attorney-general in the performance of their duties with respect thereto.

"(5) That the said Hickey had publicly charged the Honorable James L. Drinnon with being corrupt and with ruling with partiality in favor of his cousin, Alf Taylor Drinnon, an attorney at law of the Rutledge Bar.

"(6) That the said Hickey had denied on the streets of Morristown that he had written said articles for publication and disclaimed any knowledge thereof, but asserted that he heartily indorsed all therein contained and repeated that the said Drinnon was unfit to sit upon the bench, and that after several denials of the authorship of said article, the defendant, Hickey, had admitted in a sworn answer, filed by him in the circuit court of Jefferson county in the cause of *State ex rel.* v. *W. N. Hickey,* that he was not only the author of said article, but had caused it to be printed and circulated and assumed the full responsibility therefor.

"(7) It is charged that said article was not written in good faith, but was willful and malicious and made for the purpose and intent of injuring and disgracing the court and to remove the said circuit judge from the bench,

and that said article did obstruct the course of justice and did impede and hinder the trial of cases before the court at that time.

"(8) That such acts and conduct upon the part of the said Hickey rendered him guilty of unprofessional conduct and acts of impropriety that are inconsistent with the practice of the profession and rendered him unfit to remain a member of the Bar.

"To these general charges of misconduct the defendant moved the court for a more specific statement of the acts and conduct averred as causes for disbarment and contempt respecting the first, second, third, fifth, and sixth charges set forth in said citation.

"With respect to the first charge made the court sustained said motion and directed a more specific averment of the language used by the defendant, when, where and to whom spoken, wherein it had been charged that the defendant, Hickey, had circulated a report over the Second judicial circuit to the effect that he owned and controlled the court and could secure favorable rulings from him, and in response to said order to be more specific counsel representing the Honorable James L. Drinnon responded that: 'In Grainger county, Tennessee, on the —— day of ——, 1918, 1919, 1920 and 1921,' the defendant had circulated such a report in the presence of J. G. Waller, Ben Morgan, Earl West 'and divers and numerous other residents,' etc.,

"Responding to the order of the court to make charge No. 5 of the citation more specific, it was averred that the defendant, Hickey, immediately after an order had been entered by the circuit judge in a case pending in the circuit court of Grainger county at the December term,

149 Tenn.—23

1921, styled *Lewis Lumber Company* v. *A. L. Hopson, Road Commissioners,* wherein the court had granted a continuance over the protest of the defendant, Hickey, representing the defendant, Hopson, in that suit, 'and within thirty days thereafter and on divers other days, both in Grainger county and in Hamblen county,' had publicly charged the said James L. Drinnon with being corrupt and partial in his rulings, and it is averred that said statements were made in the presence of Roy Beeler, John Snow Morgan, J. G. Waller, W. E. Hodges, 'and other residents of said two counties.' "

Answering specification or charge No. 1, the defendant emphatically and positively denies that he had ever at any time or any place boasted or circulated a report to the effect that he had elected the said James L. Drinnon, or that he was in a position to get favorable rulings from him as a judge, or that he had ever at any time or place suggested to any one that he controlled the court, or had proposed to litigants that they should employ him for the reason that he was in a position to get favorable rulings from the court. It is averred that the defendant never at any time, directly or indirectly, solicited any character of legal employment; that he had always maintained a reasonable large and profitable practice without having to resort to such means in order to obtain it, and the charges made in this specification are branded as absolutely false and untrue in each and every particular.

The defendant answered specifications Nos. 2 and 5 at length, respecting a case in the circuit court of Grainger county, styled *Lewis Lumber Company* v. *A. L. Hopson, Road Commissioner,* wherein the defendant was of counsel for the said Hopson and the interested citizens.

In re Hickey.

The respondent avers that in this case quite a number of the citizens in one section of Grainger county had petitioned the road commissioner to open a road in the Fifth civil district of that county, and, acting upon the petition, the road commissioner had ordered said road opened. The Lewis Lumber Company was resisting in the above suit the opening of said road. The defendant was the attorney for the road commissioner and the citizens. The case was at issue and stood for trial at the December term, 1920, at which time it was continued upon the application of the Lewis Lumber Company. At the April term, 1921, the case was again continued on the application of the Lewis Lumber Company. At the August term following, it was again continued on the application of the Lewis Lumber Company, and the case was set specially for trial on the first day of the December term, 1921. Each continuance was had over the strenuous protest of the defendant herein, representing the defendant Hopson in that case. When the case came on for trial at the December term, the Lewis Lumber Company again moved the court for a continuance on the ground that certain of its witnesses were not present. Considerable argument was had by counsel for and against this continuance, and the defendant herein avers that he did call to the court's attention emphatically that this case had been upon the docket for trial for more than a year; that it was a public matter and that his client had the right to demand a speedy trial; that the witnesses had traveled a long way across the mountain at each term of court for a trial of this case; that the court should remember that the people of Grainger county paid its taxes and paid for the mainte-

nance and upkeep of its courts, and that to deny a trial of said case after so many continuances had been had at the instance of the Lewis Lumber Company, who was op-posing the opening of this road, was a distinct injustice.

It is averred that the court directed another continu-ance of the case, after which respondent avers that he turned to his clients, who were seated back of him in the courtroom, and, in a perfectly courteous and dignified manner, stated to them that he would be compelled to withdraw from the case becouse of the fact that he was unable to secure a trial for them, and thereupon in a short while left the courthouse.

Defendant emphatically denies that immediately after said ruling of the court and on divers other occasions, as in said citation set forth, he charged the said James L. Drinnon with being corrupt in making said ruling, or that he was ruling with partiality in favor of his cousin, A. T. Drinnon, who was one of the counsel for the Lewis Lum-ber Company, and it is emphatically and positively denied that the defendant ever at any time or at any place made such a charge in the presence of any one.

Defendant further denies the averments of specification No. 3 to the effect that in and about Morristown the de-fendant had publicly and openly abused the court by pub-licly stating that it was a farce and that the judge was un-fit to remain upon the bench. The defendant admits that he did say to certain of his friends and acquaintances, who were continually criticizing him with being responsible for the election of the said James L. Drinnon and his ele-vation to the bench, that he did realize that he had made a mistake; that the said James L. Drinnon had been a keen

disappointment to him; that he permitted his courts to drag to the great dissatisfaction of the people and the litigants; and that a change in some manner would be very desirable. The defendant avers that he did criticize the manner in which the said Drinnon held his courts, as he had the perfect right to do; but he denies that said criticism was maliciously made, or made for the purpose of stirring up public hatred against the said James L. Drinnon, and in such criticism as he did make of the manner in which the said James L. Drinnon conducted his courts it is averred that he was within his constitutional rights as a citizen and as a freeman.

The defendant admits that he wrote and caused to be published the article appearing in the Evening Mail of Morristown, Tenn., under date of March 22, 1922; but the defendant denies that the said article was written or published maliciously, with intent to hinder the said James L. Drinnon in the performance of his duties, or to stir up public hatred against the said James L. Drinnon. Defendant avers that he conceived conditions to be so intolerable in the circuit courts held by the said Drinnon that something should be done to emphatically impress upon the mind of the said James L. Drinnon the importance of conducting his courts and dispatching business in a manner more in keeping with the dignity and importance of his position. It is averred that the people, including jurors, witnesses, and attendants upon the courts, were becoming impatient and dissatisfied with the manner in which the said Drinnon held his courts; that the court was losing the respect of the people, and that he, having been one of the few lawyers in the circuit who had

supported the said James L. Drinnon, and who was being charged with having been responsible in a large measure for his election, and the said James L. Drinnon having proven such an utter disappointment to him and other friends who, along with defendant, had conscientiously supported his candidacy, he felt that he owed it to the citizenship of the county and the circuit to call to the public's attention in a way that would be impressive the manner in which the business of this court was being transacted, and in doing so, it is averred that he was within his constitutional rights as a citizen and as a freeman, and the constitutional privileges guaranteed to every citizen respecting the freedom of speech and the freedom of the press are pleaded and relied upon in defense of his actions in causing said article to be published.

Defendant avers that said article was published as a paid advertisement on the suggestion of the publisher of the newspaper; that he had requested that the article be published over his signature, but that the publisher of the paper suggested that it would perhaps be more impressive if published as a paid advertisement, and thereupon defendant agreed to this, but requested the publisher of the paper to inform any one, who might inquire as to the authorship of said article, that he had written the same and caused it to be published.

It is denied that because said article happened to have been read by jurors, witnesses, or attendants upon the court then in session in Dandridge that the court was hindered or hampered in the performance of its duties and it is averred that the defendant did not at the time said article was published at Morristown, Tenn., know that

said newspaper had a circulation in Jefferson county where the court was then sitting, and that he gave no instructions or directions about the circulation of the said paper containing the article to any one, and that said article, not referring to any case then pending in said court and not having been addressed to the judge in person, the defendant pleads and relies upon the rights and privileges with respect to the freedom of speech and the freedom of the press guaranteed to him under the Constitutions of the United States and the State of Tennessee.

Defendant further denies the charge made in specification 6 of said citation to the effect that the defendant, after having had said article published, went up and down the streets of Morristown and about the courthouse and in public places making inquiry of various citizens if they had read the article, and that this defendant, upon being asked, had denied that he was the author thereof. It is averred by the defendant that he heard numerous persons discussing said article, many of whom undertook to discuss it with him, and to some of these, with whom he did not care to enter into a discussion about the matter, he had stated that it could be found out at the office of the Evening Mail who wrote the article, and to some he either evaded the question or denied outright that he was the author thereof, preferring not to enter into a discussion with those making the inquiry.

In explanation of his conduct in causing said article to be published, the defendant further averred in said answer that when the said James L. Drinnon was a candidate for election in 1918, the defendant supported him with all the means at his command; that he and the said

Drinnon were both members of the Morristown Bar; that with the exception of himself and one other attorney of that Bar the entire Bar had, previous to the election and during the campaign, caused to be published a signed statement in one of the Morristown papers, wherein it was stated, among other things, that—

"We should regard the election of Mr. Drinnon to the high office of circuit judge as unfortunate to the citizenship of this judicial circuit. . . . Love of our profession, the good order of the circuit and our zeal for the proper administration of justice compel us to make the above statement."

Many other statements reflecting upon the ability of the said James L. Drinnon to hold a court were contained in said article.

It is further averred that the Bar of Jefferson county, with the exception of possibly one attorney, had published an article, wherein it was stated that—"From such knowledge and information as we have, we do not think that he (Drinnon) is qualified to discharge the duties of the office and believe that his election would be a great mistake and unfortunate to the people of this circuit."

That notwithstanding these attacks, and notwithstanding these statements were made by eminent lawyers, the defendant avers that he continued in his support of the said Drinnon, believing him to be a young man who would upon his election qualify himself to discharge the important duties of his position, and that with respect to the lack of ability upon the part of said Drinnon, defendant avers that there was no difference of opinion between him and the other members of his own Bar, but that, believing

Drinnon to be a young and vigorous man and having the smallest circuit in the State, he would in time develop sufficient capacity to dispatch the business of his court. It is averred that the campaign for his election became extremely heated and bitter; that he perhaps took the most prominent part of any individual supporting the said Drinnon, being exceeding active, not only in his own county, but throughout the entire circuit; that over the protest of many of his friends, and particularly among the members of his own Bar, he had continued his support unabated, believing, as he did, that the said Drinnon would in time develop a more satisfactory judicial capacity than that of his opponent; that upon the said Drinnon's election, he, the said Drinnon, came to see him and thanked him for his support, or thanked him for "having elected him," to use the expression of the said Drinnon; that he replied to the said Drinnon that he had not elected him, but that he had done all within his power to bring about his election. The defendant avers that he then told the said Drinnon that there had been made so many statements and charges throughout the circuit reflecting upon his ability and intelligence, and that he (the defendant) having supported him to the utmost over the protest of a number of his close and personal friends who had doubted the wisdom of placing the said Drinnon on the bench, that he requested the said Drinnon to study and prepare himself for the office to which he had been elected; that it was a high office with possibilities for good or for evil; that his circuit was the smallest in the State, and that he would have ample time to perfect himself by reading and studying, and that he advised him to read the leading Tennessee

cases with respect to pleading and practice and of evidence, and that he hoped that the said Drinnon would do so in order that he might make those, who had seen fit to so severely criticize his ability, regret what they had said. It is averred by the defendant that he at other times, and after said Drinnon had gone upon the bench, and after he had heard of the criticism that was being made with respect to the manner in which the said Drinnon was holding his court, that he (the defendant) had repeated this request to him, and had stated to the said Drinnon that he would be very glad to give him a list of the leading cases touching on the matters of practice and of evidence that would frequently arise in his courts, and, although these requests and offers of assistance were made by him in order to perfect judicial capacity in the said Drinnon and in order that he might become a capable judge and fill his office with credit, yet these offers of assistance and advice did not seem to be welcome, and that he was never able to get the said Drinnon to realize the responsibilities of his position, and no attempt was made by him to perfect or develop a judicial capacity.

It is further averred that conditions within the circuit became such that criticism seemed to come from every source much of which was being directed at this defendant because of the well-known fact that he had used every influence at his command to bring about the election of the said Drinnon, and because of the fact that he was being charged with being responsible for his election, this defendant felt the criticism deeply; but defendant avers that he pleaded with the critics of the said Drinnon to give him time to develop and to co-operate and bear with him

until he should, through experience and study, equip himself to more satisfactorily dispatch the business of his court.

It is averred, however, that after repeated efforts to induce the said Drinnon to exercise a more dignified and judicial disposition of matters coming before him, this defendant finally came to the conclusion that he was utterly unable to spur the said Drinnon to a realization of the great responsibilities of his office, and being unable to persuade the said Drinnon to perfect himself in matters of practice in order that he might with intelligence dispatch the business of his courts and conduct his courts with a dignity and judicial bearing necessary to command respect, this defendant avers that he naturally became regretful of his action in having supported the said Drinnon, and, realizing his mistake, he freely admitted it, and it is averred that his criticism of the manner in which the said James L. Drinnon held his court was not nearly so severe as that indulged in by other members of the Bar and citizens generally throughout the circuit. This defendant avers that particularly did he avoid criticism of the decisions of the said James L. Drinnon, but merely expressed his disappointment in that the said Drinnon had not developed as he thought he should, and that the manner in which he held and conducted his court was a keen disappointment to him as well as a great dissatisfaction to the lawyers and litigants generally.

The defendant admits that this disappointment and chagrin had been aggravated by the act of the said James L. Drinnon in the little road case hereinbefore referred to in Grainger county, wherein a continuance of the case

had been had at four consecutive terms of the court over the strong protest of the defendant at each term, and, thinking perhaps his personal relations with the said Drinnon might have had something to do with the injury which he conceived to have been visited upon his clients, he withdrew from the case, and thereafter withdrew from social relations with the said Drinnon.

Defendant reiterates that his motive in causing said article to be published was for the public good; that having exhausted all efforts to bring the said Drinnon to a realization of the responsibilities of his position and to induce him to prepare himself so as to transact the business of his court in a more dignified and intelligent manner, he thought perhaps by calling attention to his deficiency in such a pointed and emphatic way might spur him to a realization of his duties and responsibilities; that, in any event, the public was entitled to know the true state of affairs, and that he has always conceived it to be the duty of an attorney at the Bar toward the public to enlighten them with respect to the management and conduct of their affairs, and particularly the manner in which their courts are being conducted and the business thereof dispatched, and in this connection the charge is made in said answer that nowhere in said citation, nor in the petition filed by the State on the relation of its distinguished attorney-general of the second judicial circuit, are the statements made in said published article challenged or denied.

In answer to said charge made that said article was published in order to bring the court into disrepute and hinder and handicap the court in the transaction of its busi-

ness, and that said act and conduct upon the part of the defendant was the result of the defendant's realization that he did not own and control the said James L. Drinnon, the defendant replies that never at any time has he ever discussed with any judge, living or dead, the merits of any case pending before that court in which he was interested as counsel, or otherwise; that such conduct would be considered by him highly unethical and unprofessional; that he never at any time assumed to dictate to the said James L. Drinnon what action he might take, nor did he ever entertain a thought that the said James L. Drinnon should determine matters coming before him in any other manner than with impartiality and without favor to any one. It is averred that this defendant has been practicing law in the courts of this State for more than twenty-five years; that he has during that period enjoyed a reasonably successful practice; and that he looks back with a modest pride and a conscious assurance of having conducted himself at all times with scrupulous regard for the ethics of the profession and faith of his clients, and to this charge he is willing to submit, with an abiding confidence, to the judgment of his fellow lawyers with whom he has been associated and the judges before whom he has practiced, his professional probity, and to the citizens of the county wherein he has lived for more than thirty-eight years, as to whether his claim to integrity and good citizenship might be sustained.

Defendant expressly denies that he has been guilty of conduct for which he could be held for contempt of court or disbarred from the practice of law; that in speaking and writing of the manner in which the said Drinnon con-

ducted his courts he refrained from criticising the decisions of Judge Drinnon respecting any case then pending, past or prospective; that he has never at any time charged the said Drinnon with being in any manner corrupt or that his rulings were improperly induced; and that in commenting and criticizing on the manner in which he conducted the business of his courts, he (the defendant) is clearly within his constitutional rights, both State and Federal.

On behalf of the State, Judge Drinnon testified that he was elected circuit judge in August, 1918, and that the defendant was one of his chief supporters and his personal friend, and remained friendly until the December court at Rutledge in 1921; that at said term of the court the Lewis Lumber Company sought to continue its case, which was resisted by the defendant, but that he felt constrained to continue the case for the reason that the lumber company had shown proper grounds, by affidavit, for a continuance, but that he taxed the lumber company with all the accrued costs of the case; that after that time, although he had met the defendant face to face on the street many times, defendant ceased speaking to him, and that the only thing the witness knew which occasioned this conduct on the part of the defendant was because he had continued the lumber company case over his protest; that after the lumber company case had been ordered continued the defendant, in open court, turned his back on the court, and witness understood him to say that he had withdrawn from the case, but he could not catch or understand all that he said; that defendant appeared to be a little angry when he turned around, and from that day to this defendant had never spoken to him.

With reference to the article published in the Evening Mail on March 22, 1922, the next day he was engaged in holding the regular term of the circuit court at Dandridge, some twenty miles from Morristown, and that while he was upon the bench holding court and engaged in the trial of a case he noticed an unusual situation in the courtroom; that the people in attendance were whispering to each other, including lawyers and jurors; that this newspaper was being passed from hand to hand, and finally a copy of it was handed to him while on the bench and was there read by him.

The witness testified as to the effect of this article on him when read, "I was very much shocked and intimidated at the article being in the paper and at the effect it apparently had on the people," and he further testified that when he came to charge the jury he was embarrassed on account of this article.

This witness took the newspaper and pointed out the various statements therein which were untrue, and which was a substantial denial of all the charges contained therein.

On cross-examination he testified that he thought he was sometimes a little slow in holding his court, but— "I am anxious to give both sides an opportunity to present all the facts and all the law that they want to present, and perhaps I take a little too much time trying to do justice."

Gen. Creswell testified substantially as did Judge Drinnon as to the effect of said article upon the jurors and attendants at court, and denied the truthfulness of the charges contained in said article.

W. E. Hodges, a member of the county court, testified that about the first of January, 1922, defendant asked him

if he were going to vote for John L. King for county attorney, and stated that he had it in for him and was going to get him, and also another fellow, Jim Drinnon, saying that he was a disgrace to the bench of the State of Tennessee, and that if he did not get him one way he would another. Also stated that another fellow was Taylor Drinnon, and said that just as quick as he got him the balloon was going up. This witness further testified that defendant said:

"Taylor moves his finger west, and Judge Drinnon moves west; Taylor moves his finger east, and Judge Drinnon moves east. I am going to get him."

Three or four witnesses testified that shortly after the article appeared, in conversation with the defendant, he denied its authorship.

J. O. Tylor testified that in a conversation with defendant on the streets of Morristown about the first of March the defendant said to him: "I am after Jim (referring to Judge Drinnon), and I am going to get him."

Baldwin Harle testified that shortly after the Rutledge incident he had a conversation with defendant in his office in which he said:

"Baldwin, we are going to have to have us a new judge—the one we have got is not competent and cannot do the work."

And this witness testified that he went on to tell him how it could be done, saying that we could get Judge Vines to take some of this territory and that Judge Gamble could try some of the cases.

Roy Beeler, counsel for the Lewis Lumber Company in the suit referred to, testified that after the case had been

continued Mr. Hickey turned his back to the court and announced to the people in the courtroom and to his client that he withdrew from the case, as it did not seem he was able to get it tried, but that, perhaps, some other counsel could get the case tried, and that the defendant appeared to be mad when he made this statement.

Perry Atkins testified that after the lumber company case was continued, as the defendant was leaving the courtroom, he stated to him: "Perry, this is a shame or a disgrace to the taxpayers of Grainger county, the way things are dragging along here."

He said it was politics, and he says, "You can see it," and said something in regard to Mr. Drinnon, I don't remember—yes, it was that he was not competent, something to that in substance. He said:

"I tried to get him to dig out these things and to study, and he won't do it."

He said it was politics to gain the influence of Jim Welch. Jim Welch was the manager of the Lewis Lumber Company.

John Snow Morgan testified that after the continuance of the lumber company case the defendant said to him not to mention that case to him, but that "Jim has got to go," referring to Judge Drinnon.

Sam Felknor testified that in a conversation in Morristown the defendant used this language, "If we were going to the funeral," and on being asked what funeral, he said, "The funeral of 'Old Limberneck,' Jim Drinnon."

Claude Collins testified that he was deputy circuit court clerk of Grainger county, and that some months after the Lewis Lumber Company case had been continued, de-

149 Tenn.—24

fendant said to him in Rutledge, referring to that case and to Judge Drinnon and his cousin, A. T. Drinnon, that they were some combination.

While this last witness was being examined, counsel for the defendant admitted that Mr. Hickey had real animus against Judge Drinnon.

H. M. Branson testified that he was an employee of the Morristown evening Mail; that it had a circulation of about 2,000 in Hamblen, Jefferson, and other counties, that its largest circulation, outside of Hamblen county, was Jefferson county, in which county there was some two hundred or three hundred subscribers, and that most of them were in the town of Dandridge.

Chas S. Stevens, a members of the Morristown Bar, testified that he and the defendant were the only lawyers in Morristown who had supported Judge Drinnon when a candidate, and that he was an attorney for the Law Enforcement League at Morristown; that this league was not organized because of any failure of Judge Drinnon or Attorney-General Creswell to enforce the law, but in order to aid them by getting evidence against bootleggers; that the defendant was hostile toward Judge Drinnon after the continuance of the lumber company case, and that on the night after the article appeared in the afternoon paper the defendant telephoned for witness to come to his office where he discussed the article with him, and stated that there would be other like articles appearing in Grainger county, and similar propaganda would appear; that defendant further stated that this article had sized up the situation thoroughly and the man that wrote it was on his job; that defendant did not disclose the fact that he wrote the article.

This witness testified that the statement in the article as to Judge Drinnon's court having broken down and was a farce, etc., was untrue; that Judge Drinnon was a man of fine judicial temperament and had rendered good service in his court—just as good as any of the other judges who had held the court. He further testified:

"He (Judge Drinnon) is a man who is deliberate; sometimes I think his deliberation was well taken and that it was necessary for the good dispatch of business; sometimes I thought he was unusually deliberate."

R. C. Bradford, a witness for the defendant, testified that when the article was submitted to him by the defendant he advised defendant that Mr. Armstrong, the editor, would not publish it in that form, and when same was submitted to Mr. Armstrong he would not publish same. Whereupon defendant revised the article eliminating the language objected to by Mr. Armstrong, and it was published anonymously as a paid advertisement.

The defendant testified at length in his own behalf, his evidence being along the line of the statements contained in his answer. He denied that he ever charged Judge Drinnon with being corrupt. He admitted that he was angry with him, and confines his criticisms mainly to that of incompetency, insufficiency, and inability to properly preside over the circuit court. The defendant further took the position that he was protected in the publication of said article by the provisions of our Constitutions relating to freedom of speech and freedom of the press. He testified that, at the time he published said article, he believed the Evening Mail circulated in Jefferson county, where court was being held.

In regard to the Rutledge incident he admitted that when the court continued the lumber company case he became indignant. · He testified that he had helped to establish and finance the Evening Mail. He admitted that prior to the Rutledge incident he had never announced to any one that he was going to have to go after Judge Drinnon. He testified, in effect, that Judge Drinnon permitted his courts to drag, and failed to dispatch business properly beginning with the very first term of court, which he held in 1918.

He was thereupon handed a letter written by him to Mr. J. C. Lambdin after Judge Drinnon held his first court, which praised Judge Drinnon, and stated that he was going to make an excellent judge. The defendant admitted that these statements were not true, and were known to be untrue when he wrote them.

The defendant further admitted that after the Rutledge incident he became indignant at Judge Drinnon; that he was hurt; that you might call it angry; and immediately following this incident he quit speaking to Judge Drinnon when they met on the street. He further admitted that this animosity toward Judge Drinnon had continued ever since the said Rutledge court incident, and that it existed at the time he wrote the objectionable article. He also admitted that after the Rutledge court incident he likewise quit speaking to Gen. Creswell. He further testified that one reason he did not sign the article was that if he had it might have been misunderstood in the outlying counties of the circuit where it would be read.

The State bases its charge of contempt alone upon the publication of the newspaper article.

The statutory grounds of contempt in this State are as follows:

"The powers of the several courts of this state to issue attachments, and inflict punishments for contempts of court, shall not be construed to extend to any except the following cases:

"(1) The willful misbehavior of any person in the presence of the court, or so near thereto as to obstruct the administration of justice.

"(2) The willful misbehavior of any of the officers of said courts, in their official transactions.

"(3) The willful disobedience or resistance of any officer of the said courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of said courts.

"(4) Abuse of, or unlawful interfenence with, the process of proceedings of the court.

"(5) Willfully conversing with jurors in relation to the merits of the cause in the trial of which they are engaged, or otherwise tampering with them.

"(6) Any other act or omission declared a contempt by law."

Shannon's Code, section 5918.

Subsection 6 adds nothing to the other five subsections, nor does it make the common law with respect to contempt applicable. *State* v. *Galloway,* 5 Cold., 329, 98 Am. Dec., 404; *Harwell* v. *State,* 10 Lea, 548; *Scott* v. *State,* 1 Cates (109 Tenn.), 395, 71 S. W., 824; *Coleman* v. *State,* 13 Cates (121 Tenn.), 10, 113 S. W., 1045.

It is the contention of the State that the defendant is guilty under subsections 1 and 4 of the above statute.

We are of the opinion that subsection 1 refers to direct contempts committed in the presence of the court, or so near thereto as to amount to the same thing. It relates to direct personal misbehavior, for example, loud speaking or making any noise either in the courtroom or so near thereto as to interfere with the procedure of the court, and cannot be extended so as to embrace the effect that a newspaper article, published at some remote place, might have upon the attendants on the court who happened to read said article.

We are further of the opinion that subsection 4 refers to the proceedings of the court in some pending suit, and does not apply to suits that have been terminated, or to general criticisms of the court.

The State does not insist, as we interpret its contention, that the court should go beyond the provisions of the statute and find the defendant guilty of some common law contempt, not embraced within the statute. If such insistence were made, it would not be necessary to pass upon the question for the reason that, under the great weight of American authority, the publication complained of is not contemptuous. The article does not relate to any pending suit; neither does it question the integrity of the court; and the defendant positively disclaims any such intention, which is a good defense where the contrary does not clearly appear.

In its reduced form, the publication charges that Judge Drinnon is wholly unfit and incapacitated to hold the circuit court, and that, as a result, the court has broken down and has ceased to function.

The decisions holding that the publication must relate to a pending suit are as follows: *Tate, Sheriff,* v. *State ex*

In re Hickey.

rel., etc., 132 Tenn., 131, 177 S. W., 69; *State of Montana ex rel. Metcalf* v. *District Court, etc.*, 52 Mont., 46, 155 Pac., 278, L. R. A., 1916F, 132, Ann. Cas., 1918A, 985; *Ex parte Green*, 46 Tex. Cr. R., 576, 81 S. W., 723, 66 L. R. A., 727, 108 Am. St. Rep., 1035; *In re Francis B. Hart*, 104 Minn., 88, 116 N. W., 212, 17 L. R. A., (N. S.) 585, 15 Ann Cas, 197; *State* v. *Circuit Court*, 97 Wis., 1, 72 N. W., 193, 38 L. R. A., 554, 65 Am. St. Rep., 90; *Patterson* v. *Colorado*, 205 U. S., 463, 27 Sup. Ct., 556, 51 L. Ed., 879, 10 Ann. Cas., 689; *Ex parte Steinman*, 95 Pa., 220, 40 Am. Rep., 637; *Field* v. *Thornell*, 106 Iowa, 7, 75 N. W., 685, 68 Am. St. Rep., 281; *Cheadle* v. *State*, 110 Ind., 301, 11 N. E., 426, 59 Am. St. Rep., 199; *In re Dalton*, 46 Kan., 253, 26 Pac., 673; *In re Cooke*, 116 La., 723, 41 South., 49; *Sturoc's Case*, 48 N. H., 428, 97 Am. Dec., 626; *State* v. *Tugwell*, 19 Wash., 238, 52 Pac., 1056, 43 L. R. A., 717; *State of Oregon* v. *Kaiser*, 20 Or., 50, 23 Pac., 964, 8 L. R. A., 590; *State* v. *Bee Pub. Co.*, 60 Neb., 282, 83 N. W., 204, 50 L. R. A., 195, 83 Am. St. Rep., 531; *Myers* v. *State*, 46 Ohio St., 489, 22 N. E., 43, 14 Am. St. Rep., 638; *Storey* v. *People*, 79 Ill., 45, 22 Am. Rep., 158; *In re Brown*, 168 N. C., 417, 84 S. E., 690; *People* v. *Green*, 7 Colo., 237, 3 Pac., 65, 49 Am. Rep., 355; *Burke* v. *Oklahoma*, 2 Okl., 499, 37 Pac., 829; *State* v. *Sweetland*, 3 S. D., 503, 54 N. W., 415.

As illustrative of this rule, we quote from a few of the foregoing decisions, as a review of each would render this opinion unnecessarily long.

In *Tate, Sheriff*, v. *State ex rel.*, *supra*, this court said: "Violation of this order . . . was not the essence of the offense. The offense consisted in making a publica-

tion which tended to obstruct, embarrass, and improperly influence the trial of the pending cause. If the publication was calculated so to interfere with the proper disposition of the cause, its author was guilty of contempt, regardless of any order."

But the court in that case then added: "It has been said by the supreme court of the United States that:

" 'When a case is finished, courts are subject to the same criticism as other people, but the propriety and necessity of preventing interference with the courts of justice by premature statement, argument, or intimidation hardly can be denied.' *Patterson* v. *Colorado ex rel.*, 205 U. S., 454, 27 Sup. Ct., 556, 51 L. Ed., 879.

"We cheerfully agree to the foregoing expression, and believe that court proceedings and the action of judges may be made the subject of criticism and full discussion after a case is concluded. Pending the hearing of a case, however, the courts must assert their power to prevent publications that may improperly influence results."

In *State of Oregon* v. *Kaiser, supra,* the court said: "In *State* v. *Anderson,* 40 Iowa, 207, the supreme court of that State held that the publication by an attorney of an article in a newspaper criticising the rulings of a court in a cause tried and determined prior to the publication did not constitute contempt punishable by the court, and referred approvingly to *Dunham* v. *State,* 6 Iowa, 245, in which it was held that the publication of articles in a newspaper reflecting upon the conduct of a judge in relation to a cause pending in court, which had been disposed of before the publication, however unjust and libelous the publication might be, did not amount to contemp-

In re Hickey.

tuous or violent behavior towards the court, under chapter 94, Code 1851, of that State, nor that such articles were so calculated to impede, embarrass or obstruct the court in the administration of the law as to justify the summary punishment of the offender under that chapter. The inherent power of a court of justice to punish for contempt one who commits acts which have a direct tendency to obstruct or embarrass its proceedings in matters pending before it, or to influence decisions regarding such matters, is undoubted; but it can hardly be maintained, from the adjudications had upon the subject in the various states, that such power is broad enough to vest in the court the authority to so punish any one for criticizing the court on account of its procedure in matters which have fully terminated, however much its dignity and standing may be affected thereby, however unjust, rude or boorish may be the criticism, or whatever may be its effect in bringing the administration of the law in disrepute."

In *Ex parte Green,* supra, the court used this language:

"We understood relator to contend that the matter about which he was fined was not written with reference to any pending case in said court, and consequently could not and cannot be treated as contemptuous of the court. Furthermore, the same was legitimate criticism of the court and its proceedings, and is privileged, being protected under our State Constitution, which guarantees the liberty of speech and of the press. On the other hand, the State insists that the subject-matter of said article is not legitimate criticism, but is defamatory and denunciatory of the court, and is the subject of contempt; that, although said article may not relate to or refer to any case pending

before said court, it was defamatory, and calculated to
scandalize the court itself and bring it into public dis-
grace, and so serve to delay, obstruct, and embarrass the
court in the conduct and trial of all causes, and thus dis-
parage its usefulness as an instrumentality of govern-
ment. . . . .

"We are accordingly confronted with the proposition:
Can the publisher of a newspaper be held guilty of con-
tempt by using expressions, defamatory of a court and its
proceedings, which do not relate to any pending cause?
Relator has referred to a number of cases which he in-
sists are decisive of the question that the court cannot
treat as a matter of contempt any criticism, no matter
how untrue or defamatory of the court, which is not ut-
tered with reference to some particular case then pending
in the court. We have examined these, and the majority
of them would appear to bear out his contention. [Citing
authorities.]"

The court, after discussing the authorities *pro* and *con,*
says:

"So it may be said that a great majority of the American
cases require that the publication be with regard to some
pending case before it can be treated as contemptuous."

Again says the court: "As to other publications not
relating to a pending case, no matter how defamatory the
language used may be with reference to the court or the
judge thereof, this will not constitute a contempt, because
it cannot be regarded as calculated to interfere with the
administration of justice. If it is true, as has been said,
that the principal on which all constructive contempts are
allowed is the tendency to degrade the courts, and so im-

*In re Hickey.*

pair their usefulness as agencies of government, then it must be conceded that it is difficult to distinguish the evil consequences likely to ensue from denunciatory publications regarding the conduct of courts in cases no longer pending and such publications concerning cases that are pending. To the ordinary understanding, the baneful results likely to follow are equally as great in one case as in the other. However, the rule announced in the great majority of cases, and, it may be considered, the American doctrine, is that, no matter how defamatory of the court or judge a publication may be, it cannot be regarded as a contempt of court, unless it be written and published with reference to a case then pending before the court.

"We accordingly hold, inasmuch as the matter about which relator was adjudged guilty of contempt of court did not relate to a case then pending before the court, it cannot be treated as a contempt. The relator is accordingly ordered discharged."

In *State of Montana ex rel. Metcalf* v. *District Court, etc., supra,* the court, in an able opinion, reviews the authorities upon both sides and points out that the few decisions, contrary to the general rule, are based upon the common-law rule of contempt which has become obsolete even in England.

Mr. Chief Justice TAFT, in his opinion in the recent case of *Charles L. Craig, Petitioner* v. *William C. Hecht, United States Marshal for the Southern District of New York,* 44 Sup. Ct., 103, 68 L. Ed., —, says:

"If the publication criticizes the judge or court after the matter with which the criticism has to do has been finally adjudicated and the proceedings are ended so that

the carrying of the court's judgment cannot be thereby obstructed, the publication is not contempt and cannot be summarily punished by the court however false, malicious or unjust it may be. The remedy of the judge as an individual is by action or prosecution for libel. If, however, the publication is intended and calculated to obstruct and embarrass the court in a pending proceeding in the matter of the rendition of an impartial verdict, or in the carrying out of its orders and judgment, the court may, and it is its duty to protect the administration of justice by punishment of the offender for contempt."

There are a few decisions which hold that where the publication charges the court with such offense as would subject him to prosecution and removal, if true, it is contemptuous, although it does not refer to a pending suit. *In re Brown,* 3 Wyo., 125, 4 Pac., 1085; *In re Snow,* 27 Utah, 265, 75 Pac., 741; *State* v. *McClaugherty,* 33 W. Va., 250, 10 S. E., 407.

In *State ex inf.* v. *Shepherd,* 177 Mo., 205, 76 S. W., 79, 99 Am. St. Rep, 624, referred to by counsel for the State, it was held that an editor who published an article charging the members of the court with bribery and corruption, in a pending suit, was in contempt.

The only States which still adhere to the common-law rule are Arkansas, Virginia, and Vermont, and, in the latter State, there is no constitutional provision on the subject.

We are of the opinion, therefore, that the circuit court committed error in adjudging Mr. Hickey in contempt.

The next question is: Was the court justified, under the law and the facts, in suspending the defendant from

the practice of law in the courts of this State for thirty days?

Counsel for the State in their brief say:

"In order to simplify matters, the State concedes that there will not be found in this record sufficient evidence to convict appellant of the following charges contained in the citation, to-wit:

"(a) The first charge, that after Judge Drinnon's election appellant had boasted and circulated that he had elected Judge Drinnon and would be able to control him and obtain official favors from him.

"(b) That part of the fifth charge, that appellant had charged Judge Drinnon with being 'corrupt.' But the latter part of said charge which implies corruption, wherein appellant is charged with stating that Judge Drinnon ruled with partiality in favor of his cousin, A. T. Drinnon, attorney, is sustained."

With the foregoing concession it may be said that the only other matter to be considered upon the disbarment feature is the newspaper publication.

Chapter 42 of the Acts of 1919 is as follows:

"An act to prescribe grounds of disbarment of attorneys and counselors at law who have been admitted to practice in the courts of the State of Tennessee, and to prescribe the penalties and rules of procedure is disbarment cases.

"Section 1. Be it enacted by the general assembly of the State of Tennessee, that any attorney or counselor at law admitted to practice in the courts of the State of Tennessee may be disbarred or suspended from the practice of law—

"(1) Who shall commit, or may have committed, any infamous crime or misdemeanor involving moral turpitude.

"(2) Who shall seek out any person having a claim for personal injury, or having any other ground of action, in order to obtain employment by such claimant, or shall employ agents or runners for like purposes, or pay or reward, directly or indirectly, those who bring, or influence the bringing, of such cases to his office.

"(3) Who shall wrongfully retain money or property of his client for an unreasonable time after demand made.

"(4) Who shall be guilty of any fraudulent act or misrepresentation in proceedings to obtain admittance to the bar.

"(5) Who shall be guilty of any unprofessional conduct, dishonesty, malpractice, or any conduct which renders him unfit to be a member of the bar, whether heretofore spe cifically prescribed or not."

It is contended on behalf of the defendant that the legislature has the power to limit the right of the courts to suspend or disbar attorneys from the practice of the law, and therefore the right to suspend the defendant must be found within the provisions of the above act.

While the legislature cannot deprive the court of the power to suspend or disbar an attorney, the weight of authority is to the effect that it can regulate its exercise. 6 Corpus Juris, 581. And that is what the legislature has done in this State. We find it unnecessary to decide this question for the reason that, in our opinion, the act of 1919 is broad enough in its scope to embrace any case demanding suspension or disbarment.

For the State it is insisted that the conduct of the de fendant falls within those portions of subsection 5 which say:

"Who shall be guilty of any unprofessional conduct," "or any conduct which renders him unfit to be a member of the bar."

For the defendant it is insisted that these terms refer solely to conduct within the profession; that the defendant must be acting in his professional capacity of an attorney at the time of his misconduct to make him amenable to the act; that in publishing the article, and making the verbal statements complained of, he was acting as a citizen and not as an attorney. In support of the distinction as to a lawyer acting professionally and as a citizen counsel cite the following authorities: *People* v. *Green,* supra; *In re Francis B. Hart,* supra; *Austin Case,* 5 Rawle (Pa.), 205, 28 Am. Dec. 657; and the unreported case of *State* v. *Pickle,* from Knox Law, decided by the court of civil appeals in 1909.

Prior to the passage of the act of 1919, our statutes dealing with this subject, as set forth in Shannon's Code, were as follows:

"Sec. 5781. The several courts of this State may strike from their rolls any person not authorized to practice in such courts, and also any practicing attorney or counsel upon evidence satisfactory to the court that he has been guilty of such misdemeanor, or acts of immorality or impropriety, as are inconsistent with the character, or incompatible with the faithful discharge, of the duties of his profession."

"Sec. 5783. The person stricken from the rolls under either of the foregoing sections, or for other good cause, shall not be permitted to practice the profession in any court of record in this state."

This court, in construing these statutes, in *Ingersoll* v. *Coal Co.*, 117 Tenn., 304, 98 S. W., 188, 9 L. R. A. (N. S.), 282, 119 Am. St. Rep., 1003, said:

"Personal solicitation of a suit is not specifically mentioned as one of the grounds of disbarment; but it is evident that the legislature did not intend to limit the power of disbarment to the causes specifically mentioned, but an attorney may be disbarred for any good cause. Shannon's Code, section 5783.

"The legislature well knew that it could not particularize every ground for disbarment, and it also well knew that attorneys were officers of the court, and that courts have the inherent power to keep their forums pure by removing therefrom all parties appearing therein whose practices and acts tend to make them impure, or to impede, obstruct, and prevent the administration of the law, or destroy the confidence of the people in such administration. Our statute was passed in 1817, and amended in 1821. Acts 1817, chapter 51, section 1; Acts 1821, chapter 66, section 3.

"To the honor of the profession, but few occasions have arisen for its enforcement, and still less for its proper construction. The language of the act is very broad, and places the profession of the law upon a high and honorable plane; and it has been the effort of the bar, and, so far as lay in its power, the bench, to observe and maintain that high and honorable *status*."

What was said in that case, as to the legislative purpose, applies likewise to the act of 1919. By the last clause, quoted above from said act, it was intended by the legislature to confer upon the court the power to punish

the defendant commensurate with his offense by either suspension or disbarment.

Without making any refined distinction, we think the language contained in the act is sufficiently broad to cover the present case, or any other that might arise, and to enable the court to impose such punishment as the merits warrant, and without regard to whether the defendant was acting in his professional capacity or as a citizen. In other words, the right to disbar is conferred where the facts justify it, and the test is: Was the defendant guilty of such conduct as to render him unfit to be a member of the bar?

If the defendant were acting within his constitutional rights in criticizing the court, then it would follow that his conduct was not such as to render him unfit to practice his profession.

The additional specification that he charged the court with being influenced by his cousin, Taylor Drinnon, would not change the result. It was not testified that he charged the court with being corruptly influenced, and he disclaimed any such intention. To one witness he referred to the court and his cousin as being "some combination," and to another he stated that—"Taylor moves his finger west and Judge Drinnon moves west; Taylor moves his finger east and Judge Drinnon moves east. I am going to get him."

These statements were made in private conversations, and, in our opinion, are not sufficient to warrant his disbarment. We have been referred to no decisions holding such acts cause for removal, and taking the record as a whole, it is apparent that the real basis of the prosecution in this case was the publication of the newspaper article.

149 Tenn—25.

In a number of the decisions, referred to above, it was held that an attorney has the same right to criticize the court as any other citizen.

*In re Francis B. Hart,* supra, it was said: "We have, indeed, found no case, federal or State, in which an attorney was disbarred or suspended for any utterance written or spoken concerning a decision or ruling of a judge in a cause after its final determination, and not addressed to the judge in person. ∙Previous nonexercise of such power might well indicate its nonexistence.

". . . Above all others, the members of the bar have the best opportunity to become conversant with the character and efficiency of our judges. No class is less likely to abuse the privilege, as no other class has as great an interest in the preservation of an able and upright bench. The rule contended for by the prosecution, if adopted in its entirety, would close the mouths of all those best able to give advice, who might deem it their duty to speak disparagingly. 'Under such a rule,' so far as the bar is concerned, 'the merits of a sitting judge may be rehearsed, but as to his demerits there must be profound silence.' "

Chief Justice SHARSWOOD, in *Ex Parte Steinman,* supra, said:

"The first is the new provision on the subject of the liberty of the press which has been introduced into the Bill of Rights of the Constitution of 1874, and the second is that at that time the judiciary was not elective. Judges in 1835 were appointed by the Governor, and their tenure of office was during good behavior. There might then be some reason for holding that an appeal to the tribunal of popular opinion was in all cases of judicial misconduct a

In re Hickey.

mistaken course and unjustifiable in an attorney. The proceedings by impeachment or address were the course and the only course which could be resorted to effectually to remedy the supposed evil. To petition the legislature was then the proper step. To appeal to the people was to diminish confidence in the court and bring them into contempt without any good result. We need not say that the case is altered and that it is now the right and the duty of a lawyer to bring to the notice of the people who elect the judges every instance of what he believes to be corruption or partisanship. No class of the community ought to be allowed freer scope in the expression or publication of opinions as to the capacity, impartiality or integrity of judges than members of the bar. They have the best opportunities of observing and forming a correct judgment. They are in constant attendance on the courts. Hundreds of those who are called on to vote never enter a courthouse, or if they do, it is only at intervals as jurors, witnesses or parties. To say that an attorney can only act or speak on this subject under liability to be called to account and to be deprived of his profession and livelihood by the very judge or judges whom he may consider it his duty to attack and expose, is a position too monstrous to be entertained for a moment under our present system."

In *People* v. *Green,* supra, it was said: "There is a marked difference between the attorney and the nonprofessional citizen; the former is as much an officer of the court as the clerk or sheriff, and his oath of office should lead him at all times and in all places to encourage and strengthen the judges and courts in the discharge of their

official duties; but so far as this liberty of speech in connection with judicial action is concerned, his official character in no way affects him; he may talk with his neighbors, and freely comment upon the judge's official conduct in matters no longer pending, and he may criticize the same through the public press; for such acts he will be answerable only as other citizens are."

Several of the other decisions cited are to the same effect. There is some basis for disbarring an attorney for wrongfully and corruptly charging the court with an offense which is criminal, as was held in *State* v. *McClaugherty,* supra, where, in a published article, an attorney charged the court with corruptly conspiring with others to procure improper indictments; or in *Re Brown,* supra, where an attorney was disbarred for charging a member of the court with being bribed in a certain case; or in *Re Snow,* supra, where an attorney was disbarred where he charged in a pleading that a member of the supreme court bartered his judicial influence for a portion of the prospective fruits to be derived from vexatious and groundless litigation. The weight of authority, however, does not sustain this exception to the general rule permitting criticism of the court where it does not relate to a pending suit.

Where the article published simply charged the court with being inefficient and incompetent, we cannot see that the court suffers injury, if the charge is untrue. Trial courts especially have little to fear from unjust criticism of this nature. The lawyers, litigants, and witnesses attend the sessions of the court daily, observe the proceedings of the court, and are permitted thereby to judge of his competency and fitness.

In his recent work on the Life of John Marshall, Senator Beveridge refers to a number of publications, reflecting upon the integrity of the great Chief Justice, all of which he treated with silent contempt.

Nearly a century ago the supreme court of Illinois, in its opinion in *Stuart* v. *People,* 3 Scam., 405, used this language: "An honest, independent, and intelligent court will win its way to public confidence, in spite of newspaper paragraphs, however pointed may be their wit or satire, and its dignity will suffer less by passing them by unnoticed, than by arraigning the perpetrators, trying them in a summary way, and punishing them by the judgment of the offended party."

It is the duty of an attorney to refrain from doing anything which will tend to destroy the confidence of the public in the courts, or to bring the courts into disrepute. As set forth in the Code of Ethics adopted by the American Bar Association:

"It is the duty of the lawyer to maintain toward the courts a respectful attitude; not for the sake of the temporary incumbent of the judicial office, but for the maintenance of its supreme importance. Judges not being wholly free to defend themselves, are peculiarly entitled to receive the support of the bar against unjust criticism and clamor."

This is a duty which the attorney owes to his profession; an obligation to which he should subordinate his personal animus toward the particular individual who happens to be filling the office.

Mr. Hickey is a lawyer of ability and has enjoyed a splendid reputation during the more than twenty-five years that he has practiced his profession. In our opinion, the

facts did not justify the publication of the article complained of. We feel that Mr. Hickey permitted his temper to override his better judgment.

Our constitutional provision as to free speech is as follows:

"The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write, and print on any subject, being responsible for the abuse of that liberty. . . . " Article 1, section 19.

As was said in *State* v. *Circuit Court,* supra, in speaking of the power of courts to punish for contempt: "It is, and must be, a power arbitrary in its nature, and summary in its execution. It is, perhaps, nearest akin to despotic power of any power existing under our form of government. Such being its nature, due regard for the liberty of the citizen imperatively requires that its limits be carefully guarded, so that they be not overstepped. It is important that it exist in full vigor; it is equally important that it be not abused. The greater the power, the greater the care required in its exercise. Being a power which arises and is based upon necessity, it must be measured and limited by the necessity which calls it into existence."

Applying the facts of this case to the great weight of authority referred to herein, and for the reasons set forth above, we hold that Mr. Hickey's conduct was not such as to render him unfit to be a member of the bar.

It results that the judgment of the circuit court will be reversed, the suit will be dismissed, and the State will pay the costs.